In re ALLEGHENY INTERNATIONAL, INC. et al. Debtors.

SUNBEAM–OSTER COMPANY, INC., a successor to Allegheny International, Inc., Appellant,

v.

LINCOLN LIBERTY AVENUE, INC., Appellee.

Bankruptcy No. 88–448 JLC.
Civ. A. No. 91–2073.
Adv. No. 91–223 JLC.

United States District Court,
W.D. Pennsylvania.

Aug. 19, 1992.

Joseph A. Katarincic, Olivia J. Lorenzo, Katarincic & Salmon, Pittsburgh, Pa., for appellant.

Michael Lederman, Pittsburgh, Pa., Cynthia Baker, Fried, Frank, Harris, Shriver & Jacobson, New York City, John Edgar, McClure and Watkins, Pittsburgh, Pa., for appellee.

OPINION

DIAMOND, Chief Judge.

We have before us the appeal of appellant, Sunbeam–Oster Company, Inc. ("Sunbeam–Oster"), and the cross-appeal of appellee, Lincoln Liberty Avenue, Ltd. ("Lincoln Liberty"). Lincoln Liberty filed a claim for rent in a bankruptcy proceeding involving Sunbeam–Oster's predecessor, Allegheny International, Inc. The bankruptcy court allowed this claim. Sunbeam–Oster now presents two issues for review. The first is whether the bankruptcy court erred in awarding Lincoln Liberty interest on its claim. The second is whether the bankruptcy court erred in failing to reduce the amount of Lincoln Liberty's rent claim to its net present value.

In a cross-appeal, Lincoln Liberty raises four issues. The first two involve the bankruptcy court's calculation of Lincoln Liberty's claim. The third issue is whether the debtor made preferential payments to Lincoln Liberty. The final issue is whether the bankruptcy court should have dismissed Sunbeam–Oster's preference complaint because it was filed after the applicable statute of limitations had expired.

### I. *Background*

The facts in this case are not in dispute. On December 11, 1985, Lincoln Liberty, as landlord, and Allegheny, as tenant, entered into two ten year leases covering fourteen floors of a building now called the CNG Tower. These leases were amended in 1987, reducing the number of floors covered by lease. Lincoln Liberty and Allegheny agreed that the commencement date under the terms of the amended lease would be deemed to have occurred on September 30, 1987.

Allegheny never moved into the building. On February 20, 1988, Allegheny filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On March 11, 1988, Allegheny filed a motion pursuant to 11 U.S.C. § 365 to reject the amended lease. The bankruptcy court granted this motion by order dated April 7, 1988. On May 6, 1988, Lincoln Liberty filed a proof of claim in the bankruptcy case. After

amendment, Lincoln Liberty's claim totalled $9,454,481.32. On March 21, 1989, the Official Committee of Unsecured Creditors filed an objection to Lincoln Liberty's claim, asserting that it was excessive.

On September 28, 1990, pursuant to a plan of reorganization, Sunbeam–Oster became the successor to Allegheny. Lincoln Liberty filed a motion on November 2, 1990, to compel allowance of its claim and for resolution of the disputed portion thereof. The Bankruptcy Court entered an order on November 29, 1990, permitting discovery on the motion and ordering submission of briefs, with trial to commence on March 4, 1991. Lincoln Liberty sought prompt resolution of the matter on the ground that delay could cost it hundreds of thousands of dollars in lost interest. The bankruptcy court stated that Lincoln Liberty could append to its claim a claim that Allegheny's delay entitled Lincoln Liberty to interest. November 29, 1990, Transcript of Pretrial Conference at p. 9.

The parties filed cross-motions for summary judgment, which were ruled in a memorandum opinion and order of September 10, 1991. 136 B.R. 396. In its opinion, the bankruptcy court awarded Lincoln Liberty interest on the entire amount of its claim. The court stated:

> In addition, Lincoln is entitled to Pennsylvania's legal rate of interest, 6% on the amount of the claim to be paid from the date that all creditors in the same class were paid.

The bankruptcy court also held that in computing the cap on Lincoln Liberty's claims for damages under 11 U.S.C. § 502(b)(6), the rent reserved by the lease should not be discounted to its present value.

In another aspect of its opinion relevant to this appeal, the bankruptcy court based Lincoln Liberty's claim on the next succeeding 15% of the remaining term of the lease, measured in time, rather than on 15% of the rent remaining for the entire term of the lease. Further, the court concluded that Lincoln Liberty's claim should be based on the actual operating expenses for the leased premises as of the date of the bankruptcy petition date. The court also

found that pre-petition payments in the amount of $63,375.91 which Allegheny made to Lincoln Liberty constituted preferential payments. Finally, the court found that Sunbeam–Oster's preference complaint was timely.

Lincoln Liberty filed a motion for reconsideration on September 17, 1991. The bankruptcy court subsequently entered a memorandum opinion and order dated October 17, 1991, which clarified several aspects of the September 10 opinion. In particular, the bankruptcy court further explained why it was awarding interest on Lincoln Liberty's claim:

> There is an obvious. danger to creditors in a confirmed plan of reorganization in that it permits delay in the payment of claims until appeals to the objection is [sic] final. This delay of a later successful claim harms a creditor unless interest is required to be paid.

> All other creditors similarly situated were paid on December 12, 1990. Interest is easily called for in this case to discourage such a delay. Equity requires the Court to reconsider the rate of interest. The Court awards interest at the rate equal to the reorganized company's cost of funds for the entire claim.

## II. Award of Interest on Lincoln Liberty's Claim

■ We find that the bankruptcy court did not err in awarding Lincoln Liberty interest on its claim from December 12, 1990. Sunbeam–Oster emphasizes that nothing in the debtors' Plan requires or provides for the payment of interest on allowed claims. The plan provides:

> With respect to any Claim which is a Disputed Claim ... within 30 days of such Disputed Claim becoming an Allowed Secured Claim or Allowed Claim, the Reorganized AI shall distribute to the holder Distributions with the value, as a percent of their claim, approximately equal to those received by holders of Allowed Claims in the same class on the Effective Date.

(Docket Entry 8139, Exhibit 1 at 8).

Sunbeam–Oster interprets this provision to preclude payment of interest. We dis-

agree. Sunbeam–Oster cites *Jones v. Keene Corporation*, 933 F.2d 209 (3d Cir. 1991), for the proposition that where a plan of reorganization does not provide for the payment of interest, a court's denial of such interest is proper. However, *Jones* is distinguishable because in that case the plan under review explicitly prohibited the payment of interest. 933 F.2d at 214. The court explained that the plan's restriction on interest squarely conflicted with the Pennsylvania post-judgment interest statute which would grant interest in the case. The court concluded that the plan's interest prohibition controlled because the provisions of a confirmed plan are binding. The present case clearly is distinguishable from *Jones* because the Allegheny Plan does *not* explicitly prohibit the payment of interest.

Sunbeam–Oster has not cited any persuasive authority for the proposition that the bankruptcy court was prohibited from awarding interest in this case. Nor has Lincoln Liberty referred the court to any authority holding that an award of interest would be proper in a case such as this. We, too, have been unable to locate caselaw on point. We are satisfied, however, that the bankruptcy court did not err in concluding that equitable principles support an award of. interest in this case. Bankruptcy courts have made such awards in preference actions. *See, e.g., In re Southern Industrial Banking Corp.*, 87 B.R. 518, 17 Bankr.Ct.Dec. 922 (Bankr. E.D.Tenn.1988). The same equitable considerations apply here. Sunbeam–Oster had every incentive to delay resolution of Lincoln Liberty's claim. Sunbeam–Oster is not unfairly penalized by the requirement that it pay interest at a rate equal to its cost of funds from the date that all other similar creditors were paid. It was equitable for the bankruptcy court to order interest in this case and we will affirm that order.

## III. Computation of Claim: "Without Acceleration"

■ Sunbeam–Oster also asserts that the bankruptcy court erred by failing to reduce the amount of Lincoln Liberty's

claim to net present value when determining "the rent reserved by such lease, without acceleration" under 11 U.S.C. § 502(b)(6). We disagree.

Section 502(b)(6) provides a cap on claims which landlords may bring for damages resulting from termination of a lease of real property. Section 502 provides that when objections to a claim are made, the court must determine the amount of the claim as of the date of the filing of the petition, and shall allow the claim in that amount, except to the extent that

> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>
>> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed 3 years, of the remaining term of such lease, following the earlier of—
>>
>>> (i) the date of the filing of the petition; and
>>>
>>> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>>
>> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates....

11 U.S.C. § 502 (emphasis added).

This subsection serves to cap a landlord's claim for damages resulting from termination of a lease. In § 502 it provides that the amount of the cap is to be determined by calculating the rent reserved and the rent due "without acceleration." The question we now address is the meaning of the word "acceleration." The bankruptcy court interpreted "acceleration" to have the meaning it commonly carries in leases, i.e., that all rent payments become immediately due and payable upon commission of a material breach by the lessee. Under this interpretation, the rent reserved and due is calculated without application of any clause in the lease providing for acceleration.

Sunbeam–Oster argues that § 502 also instructs that the cap be calculated "without acceleration" of a second type. Sunbeam–Oster's second type of "acceleration" is somewhat technical. The general rule in

bankruptcy is that unmatured claims are allowed and entitled to payment regardless of the date of their maturity. When a petition in bankruptcy is filed, unmatured claims automatically are accelerated. There are exceptions to this rule, however. Sunbeam–Oster argues that § 502(b)(6) constitutes one such exception to the rule that the maturity date of claims are accelerated.

Sunbeam–Oster accordingly argues that in order to give effect to the "without acceleration" language, the bankruptcy court should have calculated the amount of rent reserved under the lease by reducing it to the net present value of the payments which would be due at a later point in time. Instead, Sunbeam–Oster asserts, the bankruptcy court effectively calculated the cap by means of the second type of "acceleration." Sunbeam–Oster equates the bankruptcy court's failure to reduce the damage cap to its net present value as of the petition date to the "acceleration" of the debtor's unmatured obligations.

We reject Sunbeam–Oster's argument and find that the bankruptcy court was correct that § 502(b)(6) does not require a reduction of the cap to its net present value. Sunbeam–Oster has cited no cases in support of its interpretation of the phrase "without acceleration" and we can locate none. We interpret the phrase "without acceleration" to incorporate the common meaning of "acceleration" as it is used in leases. In other words, "without acceleration" means simply that reserved rent is to be calculated without application of any acceleration clause.

In addition, the fact that the purpose of §. 502(b)(6) is to provide a cap further supports the view that the rent reserved should not be reduced to its net present value. It might make sense to discount a total claim to present value. However, the cap imposed by § 502(b)(6) itself serves to limit the claim considerably.

IV. *Computation of Claim:
"15 Percent ... of the
Remaining Term"*

■ As set forth above, in computing the cap on the amount of damages allow-

able to Lincoln Liberty, we must apply 11 U.S.C. § 502(b)(6). This section provides for the non-allowance of a claim for rent to the extent that the claim exceeds:

The rent reserved by such lease, without acceleration, for the greater of one year, or *15 percent*, not to exceed 3 years, *of the remaining term of such lease,* following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor re-possessed or the lessee surrendered, the leased property; plus

B. Any unpaid rent due under such lease, without acceleration, on the earlier of such dates....

§ 502(b)(6) (emphasis added). In the present case, the rent reserved for 15 percent of the remaining term of the lease is greater than the rent reserved for one year. The first question raised by Lincoln Liberty in its cross-appeal is the proper interpretation of the phrase "15 percent ... of the remaining term of such lease."

After carefully analyzing the statute and its legislative history, the bankruptcy court interpreted "the remaining term" to specifically refer to the total amount of time remaining in the term of the lease as opposed to the total amount of rent reserved under the lease. Lincoln Liberty challenges the bankruptcy court's interpretation. Lincoln Liberty points out that by applying § 502(b)(6) to the next succeeding period of *time* rather than to the *rent* reserved for the remaining term, Allegheny gained a benefit from a free rent period at the beginning of the lease period. Lincoln Liberty contends that this was unfair and that the bankruptcy court should have averaged the free rent and increased rent over the life of the lease.

Once again, we agree with the bankruptcy court's interpretation of § 502(b)(6). As that court explained, § 502 generally speaks in terms of *time* periods for which rent is due after termination of the lease. Specifically, the statute provides that claims cannot exceed the greater· of *one year,* or 15 percent, not to exceed *three years,* of the remaining term, following the

earlier of the *date* of the filing of the petition and the *date* surrendered. The statute is written in terms of *time.* The bankruptcy court's analysis of the legislative history demonstrates that Congress intended the phrase "remaining term" to be a measure of time, not rent.

## V. Computation of Claim: "Additional Rent"

■ The lease between Allegheny and Lincoln Liberty included a provision which permitted Lincoln Liberty to pass to its tenants the operating costs of the CNG Tower. This charge was called "additional rent." In its October 17 opinion, the bankruptcy court noted that both parties had agreed that the actual space maintenance rate for 1988 was $7.46 per square foot and the bankruptcy court applied this rate. Lincoln Liberty still agrees that $7.46 per square foot was the actual expense rate for 1988. *See* Brief of Appellee p. 37. Lincoln Liberty's complaint is that in calculating the 1989 and 1990 expense rate, the bankruptcy court used the estimated rates in effect as of the petition date, rather than the actual space maintenance rates which were later identified. Lincoln Liberty argues that if the bankruptcy court were to use the actual space maintenance rate for 1988, it also should have used the actual rates for 1989 and 1990 as well.

We will affirm the bankruptcy court on this point. Section 502(b) provides that the bankruptcy court is to determine the amount of claims "as of the date of the filing of the petition." Allegheny filed its bankruptcy petition in 1988. In calculating the claim, the bankruptcy court accordingly was obliged to use the 1988 expense rate. The parties stipulated to that rate and the bankruptcy court applied it. The fact that the actual 1988 rate was not *known* until after the petition date does not change its applicability. The bankruptcy court properly used the rates which were the actual rates in effect on the petition date.

## VI. Timeliness of Sunbeam–Oster's Preference Complaint

■ In the ninety-day period prior to Allegheny's bankruptcy filing, Allegheny made payments to Lincoln Liberty under the lease totalling $63,375.91. Sunbeam–

Oster sought avoidance of these payments as preferences pursuant to 11 U.S.C. § 547 and § 550. Lincoln Liberty argues that Sunbeam Oster's preference complaint was untimely.

Section 546(a) of Title 11 provides:

An action or proceeding under section ... 547 ... of this title may not be commenced after the earlier of—

1) Two years after the appointment of a trustee under §§ 702, 1104, 1163, 1302 or 1202 of this title; or

2) The time the case is closed or dismissed.

Sunbeam–Oster's preference complaint was filed more than two years after the commencement of the bankruptcy proceeding. However, the bankruptcy court concluded that the two year statute of limitations set forth in § 546(a) does not apply to a Chapter 11 debtor-in-possession.

We agree with the bankruptcy court, as have the majority of courts to consider this issue. Where the debtor remains in possession and a trustee has not been appointed, § 546(a) does not apply. *See, e.g., In re Mahoney, Trocki & Assoc. Inc.,* 111 B.R. 914, 918, 22 Collier Bankr.Cas.2d 1167 (Bankr.S.D.Cal.1990); *Steel, Inc. v. Windstein,* 55 B.R. 426, 428 (Bankr.E.D.La. 1985); *see also* cases cited in bankruptcy court's September 10 opinion. We respectfully decline to follow the position taken by the Court of Appeals for the Tenth Circuit in *Zilkha Energy Co. v. Leighton,* 920 F.2d 1520 (10th Cir.1990), that Congress intended for the word "trustee" to apply to a debtor-in-possession.

### VII. *Preference Payments*

■ The bankruptcy court concluded that the $63,375.91 in payments made by Allegheny to Lincoln Liberty prior to the petition were voidable preferences pursuant to §§ 547 and 550 of the Bankruptcy Code. Section 547(b) provides that the trustee or debtor-in-possession may avoid preferential transfers of a debtor's property that are for or on account of an antecedent debt owed by the debtor before the transfer was made. 11 U.S.C. § 547(b)(2). In the present case, the bankruptcy court correctly found that the lease obligation was an antecedent debt.

Lincoln Liberty argues that the payments it received in December 1987 were not on account of an antecedent debt. Lincoln Liberty bases this argument on the fact that the lease commencement date of September 20, 1987 was not determined until October, 1987, that payments due under the lease could not be computed until after that date, and that the rent for September, October and November, was not billed by Lincoln Liberty until November 17, 1987. Lincoln Liberty reasons that the payments it received in December, 1987, although credited to prior months, was not on account of an antecedent debt because no debt could be due and owing to Lincoln Liberty until the lease commencement date was determined, payments were calculated under the lease, and a bill was sent to Allegheny. Lincoln Liberty concludes that the payments it received were a contemporaneous exchange for occupancy and other rights.

The bankruptcy court properly rejected this analysis. The court found that Allegheny was obligated to pay the rent prior to the time the payments were made: the amended lease so provided. A debt is incurred when a debtor first becomes legally obligated to pay the creditor. The fact that the amounts of the payment had not been calculated when the obligation was incurred does not negate the obligation to pay.

■ Lincoln Liberty also argues that the payments fall under a statutory exception to preferential transfers. Section 547(c)(1) provides that a trustee (or debtor-in-possession) may not avoid a transfer intended to be "a contemporaneous exchange for new value" and which is in fact a "substantially contemporaneous exchange." "New value" is defined as follows:

"New value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void or voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

**830**

11 U.S.C. § 547(a)(2). Lincoln Liberty argues that it extended new value to Allegheny. We agree with the bankruptcy court, however, that forbearance by a lessor from exercising its rights under a lease does not constitute new value, particularly when the debtor is not using the property. *See In re Jet Florida System, Inc.,* 73 B.R. 552 (S.D.Fla.1987), *aff'd,* 861 F.2d 1555 (11th Cir.1988).

The Bankruptcy Code also provides an exception to the preferential transfer provision for payments made in the ordinary course of business. *See* 11 U.S.C. § 547(c)(2). The bankruptcy court concluded that this exception does not apply in the present case and we concur. The payments made by Allegheny to Lincoln Liberty were not "ordinary" but were, as the bankruptcy court described them, the product of a 'unique agreement." *See In re Jet Florida System, Inc., supra.*

### VIII. *Conclusion*

In sum, we will affirm in full the bankruptcy court's decision. We will remand the case to the bankruptcy court for a determination of "the reorganized company's cost of funds for the entire claim," which appears to be unsettled at this point.

An appropriate order will follow.