In re IRON–OAK SUPPLY CORPORA-
TION, a California corporation, dba
Iron–Oak Supply, dba Tyler–Dawson
Supply, Debtor.

Bankruptcy No. 91–20187–A–11.
MC No. DWP–234.

United States Bankruptcy Court,
E.D. California.

June 17, 1994.

See also 162 B.R. 301.

## DECISION ON OBJECTION TO CLAIM OF JOHN H. SUTTER

CHRISTOPHER M. KLEIN, Bankruptcy Judge:

The primary question in this objection to a landlord's claim for damages on a terminated lease is whether the term "surrendered" in the limitation imposed by 11 U.S.C. § 502(b)(6) [1] applies when the landlord declines the return of the premises. The secondary question, which is compelled by conflicting computations of damages and a dearth of reported cases, requires the court to examine the interplay between rejection, contract damages, mitigation, and the damages cap imposed by section 502(b)(6) in order to clarify the mechanics of calculating a landlord's allowed prepetition claim when a debtor-tenant rejects its lease.

More than $130,000 is at stake, including some $50,000 in unpaid prepetition rent that accrued after the landlord rejected debtor's surrender of the premises, which the landlord claims qualifies as a supplement to the cap pursuant to 11 U.S.C. § 502(b)(6)(B). The remainder of the dispute is an $80,000 difference of opinion regarding the method of calculating the damages cap under 11 U.S.C. § 502(b)(6)(A).

I conclude that the term "surrendered" in section 502(b)(6) is governed by state law, which requires that, in order to be effective, a surrender be either expressly or implicitly accepted. Hence, the landlord's refusal to accept surrender means that he is entitled to unpaid prepetition rent in addition to the statutory cap.

I further conclude that the cap on the amount of a landlord's damages that may be allowed as a claim is properly determined by calculating the total rent that would accrue during the first 15 percent of the months remaining on the current term of the lease in

Paul J. Pascuzzi, Diepenbrock, Wulff, Plant & Hannegan, Sacramento, CA, for Official Unsecured Creditors' Committee, Objecting Party in Interest.

John H. Sutter, in pro. per.

1. That statute provides:
   (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
   (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
   (i) the date of the filing of the petition; and
   (ii) the date on which such lessor repossessed, or the lessee *surrendered,* the leased property; plus
   (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;
   11 U.S.C. § 502(b)(6) (emphasis added).

the absence of any default, subject to the one-year minimum and the three-year maximum. A further condition is that the allowed claim may in no event exceed the actual damages that would be available under non-bankruptcy law.

## FACTS

The landlord leased a warehouse to the debtor for 120 months on a so-called triple net lease, under which the debtor promised the landlord a fixed monthly sum plus property taxes, insurance, and other expenses related to the use of the premises.

The debtor moved out at the end of July 1990, when 100 months remained on the term of the lease, and informed the landlord that it would no longer pay rent. The landlord declined to accept surrender and promptly sued for the $9,450 due as the August rent. He thereafter did nothing inconsistent with his rejection of the surrender. Prepetition legal fees were $4,790.[2] Unpaid prepetition rent exceeded $47,250, but has not been precisely calculated because the adjustment scheduled for December 1, 1990, has not been determined.[3]

The debtor filed a chapter 11 case on January 8, 1991, at which time 94.75 months remained on the lease. The monthly rent then in effect was $9,450, plus whatever increase resulted from the December 1, 1990, escalation. Taxes ($13,415/yr) were not then delinquent. Annual insurance costs totaled $1,529. The debtor promptly rejected the lease. The premises remained vacant until November 1991. Unpaid rent during that period exceeded $105,000.

In November 1991, a new tenant took possession under a 64–month lease that provided for less rent ($7,650/mo), four months of free rent, and taxes and insurance to be paid by the landlord, who also paid a leasing commission of $12,444. Ignoring all of the scheduled

annual escalations in the debtor's lease, the new tenant will pay at least $225,000 less than what the debtor would have paid.

The landlord filed a claim for damages resulting from termination seeking $381,110 without itemizing damages and without taking the statutory cap into account. Correcting these mistakes before trial on the objection, he reduced his claim by more than one-third based on his view of various possible readings of section 502(b)(6). In a nutshell, the landlord wants: (1) 15 percent of the rent reserved by the lease for its remaining term following the date of the filing of the petition; plus (2) five months of unpaid prepetition rent that accrued after the debtor vacated the premises.

The objection was filed by the official unsecured creditors' committee as permitted by the confirmed liquidating plan of reorganization. The committee argues that the correct amount of the claim is rent for the one-year period following August 1, 1990, the date of the putative prepetition surrender. It calculates the total rent as $129,431 by adding $115,668 for monthly rent,[4] plus $12,234 for taxes and $1,529 for insurance, both of which items are "additional rent" under the lease. A central premise of the objection is that the debtor "surrendered" the property for purposes of section 502(b)(6)(A) when it moved out and stopped paying rent.

## DISCUSSION

This objection to claim necessitates interpretation of: (1) the meaning of "surrendered"; and (2) the mechanics of calculating the cap in the following limitation on allowance of claims:

> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

---

**2.** Such fees are an item of "additional rent" under the lease.

**3.** The contract provides that the rent will increase each December 1 based on the previous twelve-month increase (November–November) in the "Consumer Price Index for all Urban Consumers (CPI–U) all items line, for the San Francisco–Oakland Area based on the period 1967–

100 as published by the U.S. Department of Labor's Bureau of Labor Statistics." Neither the claimant nor the objector has computed the precise adjustment even though it can readily be determined by consulting the pertinent publication.

**4.** A 3–percent CPI adjustment is assumed for December 1, 1990.

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee *surrendered,* the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

11 U.S.C. § 502(b)(6) (emphasis added).

### I

First, the question of surrender. The landlord contends that his rejection of a prepetition surrender entitles him to the unpaid rent due for the period between the rejected surrender and the date of the filing of the petition under subsection (B) in addition to the 15–percent cap imposed by subsection (A).

The creditors' committee objects to the claim and argues that the debtor's prepetition abandonment of the premises triggered the period subject to the 15–percent cap, thereby precluding any additional sum under subsection (B).

### A

The choice of law question arises because surrender can be a term of art. Plain language is useless in interpreting a word like "surrender" that has multifarious meanings. *See* 83 C.J.S. *Surrender* (1953) (cataloging meanings). Thus, whether "surrendered" in section 502(b)(6) means that the landlord must first have accepted the surrender calls for interpretation of a federal statute.

■ State landlord-tenant law, as discussed below, ordinarily views the landlord's acceptance as essential to a surrender. If, however, the usual landlord-tenant rule applies, then surrender might have contradictory meanings within the Bankruptcy Code

itself. Section 365 mandates that the trustee surrender nonresidential real property held under a lease deemed rejected, and the lessor is implicitly stripped of the power to reject surrender. 11 U.S.C. § 365(d)(4).[5] This possibility of different meanings for the same word within the same statute warrants circumspection.

■ It is axiomatic that the meaning of a word in a federal statute is a question of federal law. This precept does not, however, end the inquiry because it does not compel the conclusion that the federal rule is at variance with state law. Rather, it may be that the federal rule provides that state law governs.

### B

■ The substantive question here, whether a leasehold was surrendered five months before bankruptcy, is one of property rights. As a general rule, bankruptcy law leaves the allocation of property rights in the assets of a bankruptcy estate to the state laws that create and define those property rights. *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979). State laws are suspended in bankruptcy only to the extent that they actually conflict with the Bankruptcy Code. *Id.* at 54 n. 9, 99 S.Ct. at 918 n. 9.

#### 1

Section 502(b)(6) is not plainly in conflict with, and is perhaps only ambiguous relative to, state law. The better view is that the recognition, at subsection 506(b)(2)(B), of unpaid prepetition rent as an item to be awarded independent of the cap in the absence of surrender or repossession indicates an attempt to harmonize the statute with state law.

#### 2

■ Federal interests do not necessitate a specialized meaning of "surrendered" in connection with prepetition actions by landlords and tenants. The status of a lease at the

**5.** If such a lease under which the debtor is lessee is not timely assumed:

then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.
11 U.S.C. § 365(d)(4).

time of filing bankruptcy is ordinarily a question of state law. Thus, for example, whether a state's law permits an equity of redemption on a terminated lease as of the date of bankruptcy affects the trustee's power to assume a lease. *Vanderpark Properties, Inc. v. Buchbinder (In re Windmill Farms)*, 841 F.2d 1467, 1471–72 (9th Cir.1988).

■ If the premises are not surrendered under state law, then the lease remains in effect. Ordinarily, the landlord is entitled to monthly rent on an unexpired lease, regardless of whether the lessee uses the premises. And, in principle, the tenant can cure the default. As of the filing of a bankruptcy petition, the unpaid rent is a prepetition claim of the same dignity as any other prepetition claim. Upon bankruptcy, the debtor-lessee may reject the lease under bankruptcy law, at which point the lessor becomes entitled to the lease termination damages specified by section 502(b)(6).

■ If the premises are surrendered under state law, the situation is different. The lessor consents to the return of the leasehold estate unfettered by the rights of a tenant. The former tenant's continuing relation is merely exposure to the damages that the landlord is unable to mitigate. Likewise, if the landlord repossesses the premises, the same qualitative analysis applies.

As the leasehold estate is not being forcibly terminated by virtue of the muscle of the Bankruptcy Code, measuring the damages cap from the time of the accepted surrender or of the repossession is not irrational.

The different treatment for the maximum damages when the landlord repossesses or accepts a surrender does no particular violence to the scheme of distribution under bankruptcy law. To be sure, the one lessor's claim is greater than the other's. But the one with the smaller claim is the one who earlier elected to take control of the premises and to enjoy the benefits of that control. State law and the Bankruptcy Code are fully consistent in this respect.

Accordingly, I conclude that whether a leasehold was "surrendered" for purposes of section 502(b)(6) before bankruptcy is governed by state law.[6] That means California law in this instance.

### C

■ "Surrender" of a leasehold is a matter of contract in California. "A surrender yields the estate as distinguished from the possession and can be accomplished by express consent of the parties in writing, or by operation of law when the parties do something which implies they have consented." *Scott v. Mullins*, 211 Cal.App.2d 51, 55, 27 Cal.Rptr. 269, 272 (Cal.Ct.App.1962); *see Dorcich v. Time Oil Co.*, 103 Cal.App.2d 677, 682, 230 P.2d 10, 13 (Cal.Ct.App.1951); *see generally*, 4 B. Witkin, Summary of California Law, *Real Property* § 664 (1987); 6 H. Miller & M. Starr, Current Law of California Real Estate 2d § 18:127 (1993). In all events, surrender of a leasehold requires acceptance by the landlord—either implicit acceptance or explicit acceptance.[7]

■ This is the usual rule of state law. Mutuality is essential. 51C C.J.S. *Landlord & Tenant* § 120 (1968). When a tenant abandons leased property, the landlord has several choices available, including the option to "accept the tenant's offer of surrender of the leased property, which offer is inherent in the abandonment, and thereby terminate the lease" and the option to decline to accept the implied offer of surrender. Restatement (Second) of Property (Landlord–Tenant) § 12.1(3)(a) & cmt. i. (1976).

---

6. Indeed, a contrary rule would invite mischief. Consider what the result would be if: (1) a tenant, claiming surrender, stopped paying rent sixty months before the end of a lease term and twenty-four months before bankruptcy; and (2) the landlord had valid, enforceable state-court judgments for twenty-four months of rent as of the filing of bankruptcy. A different federal meaning of surrender could operate retroactively to take away half of the amount of the landlord's judgment.

7. Predictably, most reported decisions concerning surrender involve implicit acceptance because that is the fertile ground for dispute. That does not, however, in any way undermine the paradigm of explicit acceptance that applies here, there being no conduct suggestive of implicit acceptance of surrender.

█ In sum, when, as here, the lessor declines to accept a surrender and does nothing that would operate as an acceptance by implication, there is no surrender of a leasehold under state law and, accordingly, there is no surrender for purposes of section 502(b)(6).

## II

Having concluded that the unpaid prepetition rent is allowable as a claim under subsection 502(b)(6)(B) in addition to the statutory cap, the question becomes how to compute the statutorily capped amount.

Plain language is helpful this time. One is dealing with a "claim for damages resulting from the termination of a lease" of real property. 11 U.S.C. § 502(b)(6). The limit is:

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease

11 U.S.C. § 502(b)(6)(A).

Neither party reads this relatively straightforward language to mean what it says.

## A

█ Under a plain reading of the statute, the number of months of rent that can be claimed as damages is determined by multiplying the remaining term by 15 percent because more than 80 and fewer than 240 months remained on the lease after the date of the filing of the petition.[8] As litigated, the court was presented with a choice between allowing damages for either 15 months [9] (surrender) or 14.21 months [10] in addition to 5 months unpaid prepetition rent (no surrender). Because surrender was not complete in this case, 14.21 months is the current period.

The creditors' committee argues that one year is the cap. It reaches that view by rewriting the phrase "15 percent of the remaining term [of the lease]" to be "15 percent of the net amount of rent, after subtracting amounts received in mitigation, due for the remaining term" of the lease. It argues that the recent case of *In re Financial News Network, Inc.*, 149 B.R. 348 (Bankr.S.D.N.Y.1993), supports this view. Noting that the landlord in this instance says total actual damages were $792,160, the committee says it is being faithful to section 502(b)(6) because the $129,431 that it concedes to be allowable as rent reserved by the lease for the twelve months following the purported surrender is more than the $118,-824 that is 15 percent of $792,160.

A careful review of the facts in *Financial News* does not support the committee's proposed rewriting of section 502(b)(6). To be sure, the landlord in that case successfully claimed $1.8 million in damages by calculating 15 percent of the rent due for the remaining term. But it was not 15 percent of the total rejection damages of $4.9 million (= total remaining rent + reletting expenses − reduced rent from new tenant), it was 15 percent of the $12 million in total remaining rent, without considering mitigation. *Financial News*, 149 B.R. at 351.

The significance of the determination of total rejection damages in *Financial News* was not to calculate the cap. Rather, it was to establish the upper limit of actual damages in the absence of the statutory cap. The cap, however, is irrelevant if *actual* damages are less than the cap. Section 506(b)(6) merely establishes a limit and does not constitute a substantive damages remedy.

The procedure used to compute the cap in *Financial News*, although not strictly in accordance with the terms of section 502(b)(6), reaches the identical result as the statutory

8. The 15–percent cap applies when the remaining term of the lease is between 80 and 240 months. Specifically, the break-even point at which one year equals 15 percent of the remaining term of the lease is 80 months (12/.15 = 80). The break-even point for three years is 240 months (36/.15 = 240).

Restated, the one-year cap applies when the remaining term is 80 months or less. The 15–

percent cap applies when between 80 and 240 months remain. The three-year cap applies when the remaining term is 240 months or more.

9. .15 × 100 mos. = 15 mos.

10. .15 × 94.75 mos. = 14.21 mos.

**420**

formula only so long as rent remains constant over time. *In re Allegheny Int'l, Inc.,* 136 B.R. 396, 403 (Bankr.W.D.Pa.1991), *aff'd, Sunbeam–Oster Co. v. Lincoln Liberty Ave., Inc. (In re Allegheny Int'l, Inc.),* 145 B.R. 823, 827 (W.D.Pa.1992).

■ The correct and complete statement of the law, as supported by *Financial News,* is that a landlord's allowable damages are the lower of (1) the statutory cap computed in accordance with the ordinary language of section 502(b)(6) ignoring mitigation or (2) total rejection damages, which take mitigation into account, available under nonbankruptcy law.

In this instance, the landlord's total lease rejection damages, under any possible view of the facts, exceed $500,000 under state law.[11] What matters is that the rent reserved by the lease for the 14.21 months that constitutes 15 percent of the remaining term of the lease is less. While not yet susceptible of precise computation for the reasons stated in the next section, it is about $160,000. Accordingly, the cap applies to limit the amount that may be claimed under section 502(b)(6).

### B

■ The landlord contends he is entitled to 15 percent of the rent reserved by the lease for its remaining term and projects the remaining rent using a 6 percent estimate of the annual CPI escalator. The committee contests the 6 percent, saying that 3 percent is more appropriate and that the stream of future rent must be reduced to present value. The landlord and the committee are making a simple matter difficult.[12]

The correct interpretation, however, is that the Congress intended that the phrase "remaining term" be a measure of time, not rent. *Sunbeam–Oster,* 145 B.R. at 828, *aff'g In re Allegheny Int'l, Inc.,* 136 B.R. 396, *cited with approval, Financial News,* 149 B.R. at 353. The statute is worded in terms

of time periods. *Sunbeam–Oster,* 145 B.R. at 828; *Allegheny Int'l,* 136 B.R. at 402.

The phrase "without acceleration" only makes sense in terms of a reference to the next succeeding periods under the lease. Taking 15 percent of all the rent for the remaining term, especially where escalation clauses are present, would be tantamount to effecting an acceleration. *Id.* at 403.

■ Thus, it is necessary to calculate the rent that would accrue in the absence of lease termination to the first 15 percent of the remaining term, here 14.21 months. Any escalators that would take effect during those 14.21 months are to be honored. *Id.* at 402; *see In re Bonwit, Lennon & Co.,* 36 F.Supp. 97, 99–100 (D.Md.1940). Conversely, as in *Allegheny Int'l,* any months of free or reduced rent scheduled under the lease during those months are similarly to be honored. *Allegheny Int'l,* 136 B.R. at 402–03, *aff'd, Sunbeam–Oster,* 145 B.R. at 828. Items specified in the lease as additional rent are to be treated as rent. *Id.* at 404.

While the precise amount that the landlord may claim in this instance is uncertain, the parties may compute it from the following formula. The first component is all of the unpaid prepetition rent, including the scheduled December 1990 CPI escalation and the litigation expenses incurred prepetition in suing for rent. The second component is the monthly rent in effect on the date the petition was filed (= $9,450 × (1 + CPI escalator)), plus the portion of taxes and insurance (and any other items of "additional rent") that accrue monthly, times the number of months remaining until the December 1991 CPI escalation was scheduled. The third component is the increased monthly rent effective December 1, 1991, plus taxes and insurance accrued monthly, times the number of months necessary to reach 14.21 months after the filing of the petition.

---

**11.** The landlord says they are nearly $800,000. The committee says they are somewhat less. I need not decide the actual amount.

**12.** Their damages calculations, while perhaps correct under nonbankruptcy law, are relevant only for purposes of determining "actual" dam-

ages. When it is plain in a case that the section 502(b)(6) cap is less than any version of actual damages under nonbankruptcy law, it is futile to set damages with precision in the bankruptcy court.