In re INTERNATIONAL BIOCHEMICAL INDUSTRIES, INC., f/d/b/a BioShield Technologies, Inc., Debtor.

Herbert C. Broadfoot, II, as Chapter 7 Trustee for International BioChemical Industries, Inc., f/d/b/a BioShield Technologies, Inc., Movant,

v.

Jamestown Management Corporation, as Managing Agent for Cologne Investors, Inc. & Irving Walter Graebner, Respondent.

No. 04–92814–BEM.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed Oct. 6, 2014.

Filed Oct. 7, 2014.

Robert A. Bartlett, Herbert C. Broadfoot, II, Ragsdale, Beals, Seigler, et al., James R. Schulz, Merritt Watson, LLP, Atlanta, GA, for Trustee.

Jesse Blanco, Jr., San Antonio, TX, Herbert C. Broadfoot, II, Ragsdale, Beals, Seigler, et al., Atlanta, GA, for Debtor.

R. Jeneane Treace, U.S. Trustee, Atlanta, GA, for U.S. Trustee.

## *ORDER*

BARBARA ELLIS–MONRO, Bankruptcy Judge.

This case came before the Court on the Chapter 7 Trustee's "Objection to Claims of Creditor Jamestown Management Corporation" [Doc. No. 180], the "Amended Objection to Claims of Creditor Jamestown Management Corporation" [Doc. No.

184], and the "Response Of Jamestown Management Corporation As Managing Agent For Cologne Investors, Inc. & Irving Walter Graebner, To Trustee's Claim Objections" [Doc. No. 181]. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 158(b)(2)(B). The Court held a hearing on the objection on April 23, 2014. Having considered the evidence and legal arguments presented by the parties, the Court concludes that Jamestown is entitled to an unsecured claim capped by § 502(b)(6).

## FACTS

The facts of this case are generally undisputed. Debtor and Jamestown entered into a Lease agreement on July 6, 1999, in which the Debtor rented the premises at 5655 Peachtree Parkway in Norcross, Georgia, for commercial purposes for a ten-year term. (the "Lease") Respondent's Exhibit 3 (hereinafter referred to as "R. Ex. ——"); Trustee's Exhibit 3 (hereinafter referred to as "T. Ex. ——"). Under the Lease, Jamestown had multiple options in the event of a default, including: (1) terminate the Lease and accelerate the amounts due under the Lease; or (2) without terminating, retake possession of the property and seek indemnification from the Debtor for all costs and expenses, including damages for any inability to re-let the property or for losses sustained from re-letting the property at a lower rate. *Id., see also,* R. Ex. 6.

In December 2000, the Debtor vacated the property and stopped making Lease payments. R. Ex. 4, 6. Shortly thereafter, Jamestown initiated a dispossessory action against the Debtor in the State Court of Gwinnett County. R. Ex. 4, 6. On January 19, 2001, Jamestown received a default judgment in which it was awarded a writ of possession and unpaid rent for December 2000 and January 2001 in the amount of $151,706.10 (the "First Judgment"). R. Ex. 1, 2, 6. Thereafter, Jamestown attempted to re-let the property. R. Ex. 4, 6. In December 2001, after failing to find new tenants, Jamestown again sued the Debtor in the State Court of Gwinnett County to recover unpaid rent, late fees, and attorney fees. The state court granted summary judgment to Jamestown. R. Ex. 1, 2. The Debtor unsuccessfully appealed the order, and the Georgia Court of Appeals held that under the terms of the Lease and Georgia law, the Lease had not been terminated and Jamestown was entitled to judgment. *International Biochemical Ind., Inc. v. Jamestown Mgmt. Corp.,* 262 Ga.App. 770, 774, 586 S.E.2d 442, 446 (Ga.App.2003). R. Ex. 6. On October 31, 2003, the state court entered a final judgment awarding Jamestown damages in the total amount of $3,109,099.76, consisting of $2,826,454.33 for unpaid rent from February 2001 to October 2003 and $282,645.43 for attorney fees pursuant to O.C.G.A. § 13–1–11 (the "Second Judgment," and with the First Judgment, the "Judgments"). R. Ex. 1, 2.

Thereafter, on November 5, 2003, Jamestown recorded the Judgments with the United States Trademark and Patent Office against certain patents previously owned by the Debtor (the "Patents"). R. Ex. 1, 2. Apparently unbeknownst to Jamestown, the Debtor transferred all or part of its interest in the Patents to Nova Biogenetics, Inc. in July 2002. T. Ex. 11.

The Debtor filed a Chapter 11 petition on January 17, 2004, in the Bankruptcy Court for the Southern District of Texas. The case was transferred to the Northern District of Georgia on April 7, 2004, and converted to Chapter 7 on July 21, 2004. On January 13, 2006, the Trustee commenced an adversary proceeding to recover the Debtor's interest in the Patents for the benefit of the estate. T. Ex. 6. The

Court ruled in favor of the Trustee, and the Patents were returned to the estate free and clear of any encumbrances. T. Ex. 11; *see also,* Case No. 06–6035, Doc. No. 40.

On June 16, 2004, Jamestown filed a proof of claim asserting an unsecured claim in the amount of $3,260,805.86 based on the Lease. R. Ex. 1. On January 8, 2007, Jamestown filed an amended proof of claim asserting a secured claim in the amount of $3,395,631.21 based on the Judgments. R. Ex. 2. The Trustee objected to Jamestown's claim on the basis that it (i) is not a secured claim, (ii) is disallowed under 11 U.S.C. § 502(d) because any interest Jamestown has in the Patents is avoidable, and (iii) is subject to the rent cap in § 502(b)(6). At the April 23, 2014 hearing, Jamestown conceded that if the Debtor had no interest in the Patents at the time it filed the Judgments with the Patent Office, it does not have a lien on the Patents. Jamestown further agreed to give up its lien on account of the Judgments to the extent it is avoidable by the Trustee. Finally, Jamestown indicated that it miscalculated the interest on its claim and conceded that the claim should be reduced to $3,309,910.58.

## LEGAL ARGUMENTS AND ANALYSIS

**1. Classification of Jamestown's Claim as Secured and Applicability of § 502(d).**

Jamestown filed its proof of claim in accordance with 11 U.S.C. § 501(a) and Federal Rule of Bankruptcy Procedure 3001, and the proof of claim is prima facie evidence of the validity and amount of the claim. Fed. R. Bankr.P. 3001(f). Therefore, the burden is on the Trustee, as the objecting party, to overcome the prima facie validity of the claim. If the Trustee succeeds, the burden of proof shifts back to Jamestown to prove its claim by a preponderance of the evidence. *See* 4 Collier on Bankruptcy ¶ 502.02[3][f] (16th ed.).

The Trustee argues that Jamestown's claim should be disallowed under § 502(d), which provides as follows:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

In this case, Jamestown asserted a secured claim based on the judgment liens represented by the Judgments which it recorded against the Patents in the United States Patent and Trademark Office on November 5, 2003. The Trustee contends that no lien rights attached to the Patents because the Debtor transferred the Patents prior to the recording date. Jamestown has conceded that, to the extent the Debtor transferred its interest in the Patents prior to November 5, 2003, Jamestown did not acquire a lien in the Patents.

In addition, the Trustee contends any lien held by Jamestown is avoidable as a preference under § 547 because the Judgments were filed in the patent office within 90 days of the January 17, 2004 petition date.[1] Jamestown does not dispute that the lien, to the extent it exists, is avoidable

---

1. A transfer may be avoided as a preference if, among other things, it occurred "on or within 90 days before the date of the filing of the petition[.]" 11 U.S.C. § 547(b)(4)(A).

under one or more of the sections listed in § 502(d). However at the April 23, 2014 hearing, Jamestown agreed to give up its lien in the Patents. Having, in effect, turned over the property at issue, § 502(d) does not operate to disallow Jamestown's claim.

The Trustee contends Jamestown's concessions are too little, too late and that Jamestown should have amended its proof of claim when first alerted to the problems with its lien. The Trustee offers no authority for his position. Section 502(d) contains no deadlines for the claimant to turnover property, and the Court declines to create one in this case. *See Nordberg v. Arab Banking Corp. (In re Chase & Sandborn Corp.),* No. 83–000889, AP No. 86–0493, 1991 WL 26596, at *2 (giving a preference creditor a reasonable time after entry of the § 502(d) order to pay the amount of the preference) (citing Fed. R. Bankr.P. 3002(c)(3)).

Based on the representations of counsel for Jamestown at the April 23, 2014 hearing, to the extent Jamestown obtained any lien rights in the Patents it has turned over those rights. Therefore, for purposes of the Debtor's bankruptcy case, Jamestown holds a general unsecured claim that is not subject to disallowance under § 502(d).

## 2. Applicability of § 502(b)(6).

The trustee contends further that Jamestown's claim should be limited by § 502(b)(6),[2] which provides as follows:

(b) ... the court ... shall allow such claim in such amount, except to the extent that—

. . .

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claims exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and (ii) the date on which such lessor repossessed or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.]

11 U.S.C. § 502(b)(6).

The Trustee does not argue that the Lease terminated prepetition by operation of state law or by its terms.[3] Instead, he

---

**2.** As noted, *supra,* when a proof of claim is prima facie valid, the party objecting to the claim has the burden to overcome that prima facie validity, after which the burden is shifted back to the claimant. When the claim objection is made pursuant to § 502(b)(6), which merely caps an otherwise allowable claim, there is some question of how the burden of proof should be allocated. *Compare In re Blatstein,* No. 97–3739, 1997 WL 560119 (E.D.Pa. Aug. 26, 1997) (citing 4 Collier on Bankruptcy ¶ 502.03[7][c], [d] ) ("The landlord bears the burden of proof under § 502(b)(6).") *with In re MDC Systems, Inc.,* 488 B.R. 74, 81 (Bankr.E.D.Pa.2013) (holding that the objector has the burden of proof on all issues under § 502(b)(6) because it is in

the nature of an affirmative defense). The Court agrees with *MDC Systems* in part. Because the Trustee is seeking to limit the claim, he bears the burden to show that § 502(b)(6) applies to the claim. However, if the Trustee succeeds, the Court finds it appropriate to shift the burden to Jamestown to prove the amount of its capped claim.

**3.** The Georgia Court of Appeals expressly held that the Lease had not been terminated and that it represented an exception to the "general rule ... that when a landlord evicts a tenant and takes possession of the premises, the lease is terminated and the right to claim rent which accrues after eviction is extinguished" because the parties to the lease had

relies on the deemed rejection of the Lease under § 365(d) as the terminating event and the trigger for application of § 502(b)(6). Once § 502(b)(6) is triggered, the Court must apply the cap from the earlier of (1) the petition date or (2) repossession of the property by the lessor or surrender or the property by the lessee. 11 U.S.C. § 502(b)(6)(A)(i) and (ii).

With respect to the application of the cap, the Trustee argues that whether a property has been "surrendered" for purposes of § 502(b)(6) should be determined in accordance with bankruptcy law rather than state law because: (1) the term should be interpreted consistently with interpretation of the same term in § 365(d)(4), by which a lessor is required to accept a surrender of property by the debtor; (2) state law determines the amount of the underlying claim, but bankruptcy law determines how much of that claim will be allowed; and (3) a federal definition of surrender allows the claim to be limited starting on the date on which the debtor ceased to receive any benefit from the lease. The Trustee contends the cap should be applied to limit any damages that accrued after December 9, 2000, when he argues the Debtor vacated the premises, or after January 19, 2001, when the writ of possession issued.

Jamestown contends that § 502(b)(6) does not apply to its claim because its Lease was never terminated and its claim consists solely of amounts that came due prepetition while the Lease was still in effect. Furthermore, Jamestown argues that it did not sit idly by and let its claim accrue, rather it actively searched for a replacement tenant after the Debtor vacated the premises. Jamestown focuses its argument on the lack of termination under state law of the Lease and the resulting

inapplicability of § 502(b)(6) and, thus, other than distinguishing the authority relied on by the Trustee as "a virtual stand-alone minority," opinion, does not address directly the question of how the terms "surrender" and "repossession" should be interpreted.

■■■ Bankruptcy courts are bound by the plain language of the Code. *U.S. v. Ron Pair Enterprises., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). A statute that is unambiguous must be enforced according to its terms unless the result is "demonstrably at odds" with congressional intent. *Id.* at 242, 109 S.Ct. 1026. Thus, the Court's analysis of the threshold issue, whether § 502(b)(6) applies to Jamestown's claim, must begin with the language of § 502(b)(6).

### Does Section 502(b)(6) apply to Jamestown's Claim?

Section 502(b)(6) states that it applies to "the claim of a lessor for damages *resulting from the termination* of a lease of real property. . . ." (emphasis added). Based on the language of § 502(b)(6), the Trustee must show that the Lease terminated and that the damages claimed by Jamestown resulted from that termination. *See* Michael St. Patrick Baxter, "The Application of § 502(b)(6) to Nontermination Lease Damages: To Cap or Not to Cap?" 83 Am. Bankr.L.J. 111, 122–23 (Winter 2009).

The Trustee argues that rejection of the Lease is equivalent to termination for purposes of § 502(b)(6) and relies on the fact that although § 365(g) provides that rejection of the lease constitutes a breach (as opposed to termination), courts "treat the rejection of a lease under section 365 as equivalent to a termination by breach for purposes of capping a landlord's allowed

chosen to contract around the general rule. *See, Intern. Biochem. Indus. v. Jamestown*

*Mgmt.,* 262 Ga.App. 770, 773, 586 S.E.2d 442, 445 (2003).

damage claim under section 502(b)(6)." 4 Collier on Bankruptcy ¶ 502.3[7][b] (16th ed.); *see also In re Rhodes, Inc.*, 321 B.R. 80, 84 (Bankr.N.D.Ga.2005) (Massey, J.).

In contrast, Baxter argues that Congress recognizes breach and termination as separate and distinct concepts and that § 365(g) provides that rejection is a breach, not a termination. 83 Am. Bankr. L.J. at 118–19. Further, § 365(h)(1)(A) sets forth the circumstances when the rejection of a lease by a debtor-lessor may be treated as a termination by the lessee, but it does not require the lessee to treat rejection as a termination. *Id.* at 119. In addition, § 562(a), which governs derivatives contracts, treats rejection and termination as separate events. *Id.*

Other than to note the clear language of § 365(g) and the differing opinions regarding whether breach and termination are equivalent for purposes of § 502(b)(6), the Court does not decide whether a rejection should be treated as a termination for purposes of § 502(b)(6) because such a determination is unnecessary to the resolution of the objection. This is because, even if the Court accepted the Trustee's argument that rejection is equivalent to termination, the Trustee must still establish that the damages claimed by Jamestown are a result of the rejection (the "termination" event) of the Lease.[4] To allow otherwise would be to read the causal connection required by § 502(b)(6) out of the Code in violation of the mandate that each word of a statute should be given meaning. *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 131 S.Ct. 716, 724, 178 L.Ed.2d 603 (2011); *Myers v. Toojay's Mgmt. Corp.*, 640 F.3d 1278, 1285 (11th Cir.2011). Because a rejection that occurred in 2004 cannot be the cause of damages for rent due and owing in January 2001 and October 2003, the Trustee cannot establish the required causal connection between rejection and the damages claimed by Jamestown.

This inability to establish the necessary causal connection between rejection and Jamestown's damages is not fatal to the Trustee's objection, however, because the question whether the rent cap applies turns on the meaning of "termination." If termination as used in § 502(b)(6) is something different than termination under Georgia law, then it is possible that § 502(b)(6) applies to limit Jamestown's claim.

In *Flanigan v. Samalex Trust (In re Flanigan)*, 374 B.R. 568 (Bankr.W.D.Pa. 2007), the Court considered whether termination as used in § 502(b)(6) was limited to the state law definition of the term or whether Congress meant that term to be

---

**4.** The question of whether a lessor's claim is one "for damages resulting from the termination of a lease" also comes up in the context of claims for non-rent damages, such as maintenance and repairs. Courts often find that the rent cap does not apply to such claims. *See e.g., In re El Toro Materials Co., Inc.*, 504 F.3d 978, 981 (9th Cir.2007)("[a]ssuming all other conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it?"); *In re Best Products*, 229 B.R. 673, 679 (Bankr. E.D.Va.1998) (weight of authority favors limiting application of cap to "damages which the lessor would have avoided but for the lease termination"); *In re Dronebarger*, No. 10–10889, 2011 WL 350479, at *13 (Bankr. W.D.Tex. Jan. 31, 2011), (damages arising from the debtor's failure to make repairs were not damages resulting from termination); *In re Energy Conversion Devices, Inc.*, 483 B.R. 119, 125 (Bankr.E.D.Mich.2012) (adopting reasoning of *El Toro* ). However, there is not complete consensus on this issue. *See In re Mr. Gatti's, Inc.*, 162 B.R. 1004, 1013–14 (Bankr.W.D.Tex.1994) (damages for debtor's failure to maintain the property are subject to cap); *In re Foamex Int'l, Inc.*, 368 B.R. 383, 394 (Bankr.D.Del.2007) (damages for debtor's failure to perform maintenance and repair capped).

something slightly broader than the state law term. In *Flanigan*, the issue was whether the lessor's claim, which primarily consisted of accelerated rents, was subject to the rent cap. *Id.* at 572. The court found the record to be "murky" on whether the Lease had terminated under state law.[5] *Id.* at 576. However, it declined to rely solely on state law when deciding whether the rent cap applied because it concluded that to do so could lead to an absurd result. *Id.* at 577. The court said that if state law controls, a landlord can avoid the cap "by simply not 'terminating' the lease if and when a lease is rejected, and instead *cause accelerated rent claims to swallow the assets* available for distribution to creditors...." *Id.* (emphasis added). The court concluded that § 502(b)(6) applies when the lease has been terminated under state law or when "there is an uncured breach of a lease coupled with an intentional abandonment of the premises to the landlord, similar to rejection under § 365 of the Bankruptcy Code when the tenant itself is in bankruptcy." *Id.* at 578. This ensures that "landlords are not placed in an even more advantageous position than they already are by virtue of being able to retain and benefit from their asset." *Id.*

The Court finds the *Flanigan* court's analysis persuasive, especially when considering the reasons Congress instituted the cap and the fundamental bankruptcy policy of equality of distribution. *Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46 (1990). Section 502(b)(6) "is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors

from recovering a dividend from the estate." H.R.Rep. No. 95–595, at 353 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6309. "The primary concern of the drafters of the legislation 'was limiting *prospective* damage claims ...' " *In re Best Products Co., Inc.* 229 B.R. 673, 679 (Bankr.E.D.Va. 1998) (quoting *In re Atlantic Container Corp.*, 133 B.R. 980, 987–88 (Bankr.N.D.Ill. 1991)); *see also In re Lindsey*, No. 96–2268, 1997 WL 705435, at *2 (4th Cir. Nov. 7, 1997) ("in practice, Bankruptcy Code § 502(b)(6) acts as an equalizer between the claims of lessors, who can mitigate their damages by reletting, and those of other creditors" who have no similar recourse.)

Jamestown's claim represents 77% of the total claims filed and is an amount approximately equal to 5 years of base rent provided for in the Lease, which had a 10–year term. *See* R. Ex. 3. This sizeable claim is based on a Lease that was de facto, if not de jure, terminated when Jamestown obtained a writ of possession after the Debtor vacated the premises. As a result, any damages that arose after the date of the writ of possession, including late charges, interest, and attorney fees are prospective damages of the type contemplated by the drafters of § 502(b)(6). In fact, as the state court pointed out, the only reason the Lease did not technically terminate upon dispossession was because the parties had contracted around state law. *International Biochemical*, 262 Ga. App. at 773, 586 S.E.2d at 445.

The definition of "termination" crafted by the *Flanigan* court provides for implementation of § 502(b)(6) in the way it

---

5. The court in *Flanigan* examined the state law of Pennsylvania, under which surrender by the lessee does not by itself result in termination of a lease. The lessor must also accept that surrender. 374 B.R. at 576. Georgia

follows a similar rule. *See In re Smith*, 249 B.R. 328, 335 (Bankr.S.D.Ga.2000) ("In Georgia, a lessee's surrender of premises has no legal effect until expressly or impliedly accepted by the lessor.") (collecting cases).

was intended—to limit large claims for rents and related damages that arise after the beneficial interest in the premises has shifted in its entirety from the lessee to the landlord—while also serving the fundamental bankruptcy purpose of equality of distribution. In other words, the cap applies after the lease has effectively terminated.[6] The Court adopts the *Flanigan* court's definition of termination and finds that the Lease between the parties terminated for purposes of § 502(b)(6) on January 19, 2001, the date the writ of possession was issued. Because Jamestown's claim includes damages resulting from termination of the Lease, the § 502(b)(6) cap applies to the claim, and the Court must determine the date from which the cap will be calculated.

### When does the cap begin running?

Under § 502(b)(6)(A), the cap applies beginning on the earlier of (i) the petition date or (ii) the date the lessor repossessed or the lessee surrendered the property. A lessor's claim will also include any unpaid rents due as of the earlier of the two dates. 11 U.S.C. § 502(b)(6)(B). The Trustee argues the Debtor surrendered the property when it vacated the property on December 9, 2000; in the alternative, Jamestown repossessed the property when it obtained a writ of possession on January 19, 2001.

■ Under the majority view, the dates of "surrender" and "repossession" are determined by reference to state law. *See In re Smith,* 249 B.R. 328, 335 (Bankr. S.D.Ga.2000) (Dalis, C.J.); *In re Iron–Oak*

*Supply Corp.,* 169 B.R. 414, 415 (Bankr. E.D.Cal.1994); *1500 Mineral Spring Assoc., L.P. v. Gencarelli,* 353 B.R. 771, 786 (D.R.I.2006). Under Georgia law, surrender requires acceptance by the landlord. *Smith,* 249 B.R. at 335. In *Iron–Oak Supply,* the court recognized that landlords cannot refuse to accept a surrender executed under § 365(d)(4), which requires the trustee to "immediately surrender" property to the lessor when a lease is deemed rejected. 169 B.R. at 417. As a result, applying a state law definition to § 502(b)(6)(A)(ii), may create a discrepancy in how "surrender" is interpreted in different sections of the Code. *Id.* However, the "surrender" referenced in § 502(b)(6) is a question of property rights, which are determined by state law unless the state law conflicts with the Bankruptcy Code. *Id.* (citing *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979)). The court found no plain conflict and concluded that "federal interests do not necessitate a specialized meaning of 'surrendered' in connection with prepetition actions by landlords and tenants." *Id.* at 417. Therefore, the court applied a state law definition. *Id.*

The Trustee relies heavily on the contrary authority of *In re MDC Systems, Inc.,* 488 B.R. 74 (Bankr.E.D.Pa.2013), in which the court applied an ordinary meaning to the word "surrender" for purposes of § 502(b)(6), rather than the state law definition of surrender. *Id.* at 85. The court reasoned that "use of state law leads

---

6. Jamestown argued that this Court is bound by res judicata to the determination by the Georgia Court of Appeals that the Lease had not terminated. Res judicata is the doctrine of claim preclusion. Here the Trustee has asserted no causes of action subject to preclusion. However the issue of lease termination could be precluded under principles of collateral estoppel. Collateral estoppel requires

identity of issues in two separate proceedings. *In re Morrow,* 508 B.R. 514, 520 (Bankr. N.D.Ga.2014). Because the Georgia Court of Appeals determined whether the Lease was terminated under Georgia Law and the issue before this Court is termination under the Bankruptcy Code, an identity of issues is not present in this case and collateral estoppel does not apply.

to an absurd result: a surrender would eliminate the landlord's claim entirely, making it unnecessary to 'cap' *the claim for future rent,* thus rendering § 502(b)(6)(A) superfluous." *Id.* at 86 (citing *In re Main, Inc.,* No. 96–1909DAS, 1997 WL 626544, at *7 (Bankr.E.D.Pa. Oct. 7, 2007)) (emphasis added). It also applied a textual analysis of § 502(b)(6). If Congress had intended "surrender" to mean the type of surrender required by state law to terminate a lease, it could have used the word "terminate" instead. The fact that it referred to either the date the "lessor repossessed" or the "lessee surrendered" the property indicates that Congress intended that either one of those unilateral actions would be sufficient to set the cap date. Furthermore, the term "surrender" should not have different meanings in different provisions of the Code. Under § 365(d)(4), a surrender can be effected without the lessor's acquiescence. The same interpretation should apply to a surrender under § 502(b)(6). *Id.* at 86 (citing Eric D. Winston & Nathan A. Schultz, Sizing Up the "Cap": Commercial Lease Rejection Claims in Bankruptcy, 27 Cal. Bankr.J. 209, 226–27 (2004)). Finally, the court pointed out that the purpose of § 502(b)(6) "is to reduce a landlord's claim for the period of time in which a valid state law claim for rent exists, but after the leased premises ceases to provide any benefit to the debtor of the bankruptcy estate." *Id.* at 86–7. A federal definition of "surrender" best suits that purpose. *Id.* at 87.

█ Here, the Debtor stopped paying rent in December 2000. *See* R. Ex. 4. The Trustee puts the date of "surrender" at December 9, 2000, based on the Georgia Court of Appeals statement "that when Bioshield vacated the premises on December 9, 2000, it left behind some telephone equipment" *Intern. Biochem.,* 262 Ga.App.

at 775, 586 S.E.2d at 447. It is unclear what "vacating" means in this context because there is no evidence of communication with Jamestown regarding vacating or surrender. All that is known is that Debtor vacated the leased premises and apparently did so incompletely, having left some property behind. Thus, even if the Court were to accept a non-state law definition of surrender, the evidence is insufficient to show when the surrender occurred. By contrast, the date of repossession is certain. The state court issued a writ of possession on January 19, 2001. As a result, under any definition of the term, Jamestown "repossessed" the property on January 19, 2001. Because the repossession occurred prior to the petition date, January 19, 2001, is the appropriate to begin calculating the rent cap.

## Conclusion

Jamestown is entitled to a general unsecured claim. The claim is subject to the rent cap in § 502(b)(6). The cap shall be calculated from January 19, 2001.

Accordingly, the Trustee's objection to claim is hereby OVERRULED in part and SUSTAINED in part. Jamestown is ORDERED to amend its proof of claim consistent with this Order.

**IT IS ORDERED**