In re **FIFTH AVENUE JEWELERS, INC., Debtor.**

**FIFTH AVENUE JEWELERS, INC., Movant,**

v.

**GREAT EAST MALL, INC., Respondent.**

**Bankruptcy No. 96–21953–MBM.**
**Motion No. 96–2848–M.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Dec. 16, 1996.

---

**15.** In addition to AT & T, Debtor scheduled the following debts:

GM Card—$6,400.
First Card—$2,000.

Robert G. Sable and Alan K. Sable, Sable, Makoroff and Gusky, P.C., Pittsburgh, PA, for Fifth Avenue Jewelers, Inc.

Jonathan K. Schoenike, Youngstown, OH, for Great East Mall, Inc.

## MEMORANDUM OPINION

M. BRUCE McCULLOUGH, Bankruptcy Judge.

### STATEMENT OF FACTS

Fifth Avenue Jewelers, Inc. (Fifth Avenue), movant in this proceeding and the debtor in this Chapter 11 case, objects to the claims of Great East Mall, Inc. (Great East), respondent herein. Great East's claims, which total $220,843.38, represent alleged damages for Fifth Avenue's breach of a real property lease agreement between the parties. Fifth Avenue breached the lease by vacating the leased premises without the consent of Great East on or about March 29, 1994, which was two years and seven months prior to the expiration of the lease and approximately two years before this bankruptcy case was commenced. As a result of Fifth Avenue's breach, Great East sought and obtained a judgment against Fifth Avenue for $60,326.48 in the Ohio Court of Common Pleas, Mahoning County, on March 8, 1995.[1] An examination of that court's opinion reveals that Great East was granted damages apparently in the amount that it would have received pursuant to the lease agreement through December 1, 1994. According to the lease agreement, the monthly lease amount was set at $3,000.00. The lease agreement also contained clauses calling for the payment by Fifth Avenue of additional things such as common area maintenance, real es-

tate taxes, and certain insurance provided by Great East. This Court also presumes that the state court judgment may have contained an amount for liquidated damages, which were also called for in the lease agreement in the event of a breach. Great East supplemented its 2 proofs of claim with exhibits the contents of which are summarized as follows:

Claim #1, "Pre–Petition Claim" for the period through April 15, 1996 (the day preceding the date of debtor's petition):

| | |
|---|---|
| Rent | $ 46,500.00 |
| Judgment Entry | 60,326.48 |
| Interest on Judgment | 14,478.40 |
| Common Area Maintenance | 2,890.81 |
| Real Estate Tax | 1,515.61 |
| Insurance | 672.53 |
| Service Charges | 9,255.10 |
| Liquidated Damages | 25,577.19 |
| TOTAL | $161,216.12 |

Claim #2, "Rejection Damages" for One Year from April 16, 1996 (date of debtor's petition), which exceeds 15% of the remaining term of the lease as the lease was set to expire on November 30, 1996:

| | |
|---|---|
| Rent | $36,000.00 |
| Common Area Maintenance | 2,149.98 |
| Real Estate Taxes | 1,164.00 |
| Insurance | 492.31 |
| Liquidated Damages | 19,820.97 |
| TOTAL | $59,627.26 |

Fifth Avenue disagrees with the amount of Great East's claims, asserting that 11 U.S.C. § 502(b)(6) limits said claims to a lesser amount. In particular, Fifth Avenue argues that the pertinent date for calculation of the cap under § 502(b)(6) is either (a) March 29, 1994, which, according to Fifth Avenue, is when it surrendered the leased premises to Great East for purposes of § 502(b)(6), or (b) September 1, 1995, which is apparently the date upon which Great East commenced mitigation of its damages and, according to Fifth Avenue, when it also repossessed the leased premises for purposes of § 502(b)(6). Great East steadfastly disputes this contention by Fifth Avenue, maintaining that (a) it has calculated its claims properly with the cap in mind, and (b) that the pertinent date for calculation of the cap is April 16, 1996, which

---

1. The Court is aware that Fifth Avenue (a) asserted, as a defense to its breach, fraud on the part of Great East, and (b) is pursuing said defense through an appeal of the judgment handed down by the Ohio Court of Common Pleas, Mahoning County. Because of this appeal and, thus, the possibility for alteration of a portion of Great East's claims, the Court views said claims as presently unliquidated. The Court, therefore, will estimate said claims for the purpose of their allowance under 11 U.S.C. § 502 pursuant to 11 U.S.C. § 502(c)(1).

was the petition filing date in this case. The parties also disagree as to whether calculation of the cap under § 502(b)(6) can include charges for items in addition to unpaid rent, such as real estate taxes, insurance, and liquidated damages. Great East further argues that this Court, consistent with the Full Faith and Credit provision of the United States Constitution, cannot reduce that portion of Great East's Claim #1 representing the state court judgment that it has already received notwithstanding the express language of § 502(b)(6). Finally, the parties dispute whether Great East can, pursuant to 11 U.S.C. § 365(d)(3), recover as an administrative expense that portion of its Claim #2 for the 60–day period following April 16, 1996 (i.e., until the lease was deemed rejected by operation of law under 11 U.S.C. § 365(d)(4)).

At the hearing on this motion and in papers filed subsequently with this Court, Great East indicates that it has partially mitigated its damages by reletting the leased premises to alternate tenants. Such mitigation, which commenced on approximately September 1, 1995, will have an impact, at a minimum, on the calculation of Great East's actual damage claims.

### DISCUSSION

Section 502(b)(6) provides, in pertinent part, that:

> ... if ... [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> .    .    .    .    .
>
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>
> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three

years, of the remaining term of such lease, following the earlier of—

> (i) the date of the filing of the petition; and
>
> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>
> (B) any unpaid rent due under such lease without acceleration, on the earlier of such dates[.]

11 U.S.C.A. § 502(b)(6) (West 1993). Importantly, "[s]ection 502(b)(6) is not a formula for determining the total allowable damages incurred by a lessor ... [but r]ather ... casts a limitation on the amount a lessor may claim for unpaid rent." *In re Steven Windsor, Inc.*, 201 B.R. 133, 135 (Bankr.D.Md. 1996) (citing *In re Allegheny Intern., Inc.*, 136 B.R. 396, 401 (Bankr.W.D.Pa.1991), *aff'd and remanded*, 145 B.R. 823 (W.D.Pa.1992)). "The amount of the lessor's claim[,] therefore[,] must be ascertained prior to the application of § 502(b)(6)." *Id.* (citing *In re All for A Dollar, Inc.*, 191 B.R. 262, 264–65 (Bankr.D.Mass.1996); *In re Thompson*, 116 B.R. 610, 613 (Bankr.S.D.Ohio 1990)).

### I. Calculation of Great East's actual damage claims.

The Court finds, although it presumes that both parties agree, that (a) the lease has been terminated, thereby resulting in damages, and (b) the amount of Great East's damages before application of the § 502(b)(6) cap is ascertained by reference to the lease agreement and the application of pertinent state law, which in this case is that of Ohio.[2] *Allegheny Intern.*, 136 B.R. at 401 ("the landlord computes ... [his] claim under applicable non-bankruptcy law"); *Windsor*, 201 B.R. at 135 (citing *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), for the proposition that "[t]he determination of property rights under lease agreements and otherwise is governed by state law and the agreement between the parties"). A dispute nevertheless persists in this case over whether the lease was terminated under Ohio law pre-petition, with Fifth Avenue asserting

---

**2.** According to paragraph 44 of the Lease Agreement between the parties, found on page 37 therein, the lease "shall be governed by and construed in accordance with the applicable laws" of Ohio.

that said termination occurred on either March 29, 1994 or September 1, 1995, and Great East contending to the contrary. Because the amount of damages incurred by Great East cannot be calculated until this issue is resolved, an evidentiary hearing will be scheduled regarding said issue unless it is resolved by stipulation among the parties. Although whether the lease was terminated under Ohio law pre-petition must be ascertained, the Court notes that, if the lease agreement was not so terminated, then it was terminated for the purpose of administration of this bankruptcy case by the deemed rejection of the lease on June 15, 1996 pursuant to 11 U.S.C. § 365(d)(4).[3] *In re Elephant Bar Restaurant, Inc.,* 195 B.R. 353, 356 (Bankr.W.D.Pa.1996).

█ With respect to the particular damage items that Great East may include in its claims, Great East may seek recovery for those items that are contractually set forth in the lease agreement as interpreted under, and that are also permitted by, Ohio law. In this regard, the Court will accept for now those items listed in Great East's claims, except that (a) rent in Claim #2 may only be recovered for seven and one-half (7½) months, or until the expiration of the lease, rather than 12 months, and (b) damages in both claims shall be reduced by the net proceeds that Great East received in mitigation of its damages (i.e., after allowance for its reletting costs). The Court's stance is predicated upon its belief that Fifth Avenue's objections primarily pertain not to the calculation of the damages themselves (with the exception of whether the lease was terminated under Ohio law pre-petition and the exact amount of net mitigation proceeds) but rather only to Great East's calculation of the § 502(b)(6) cap. However, if Fifth Avenue wishes to register additional objections regarding Great East's calculation of the damages themselves, then it must do so subsequent to issuance of this opinion and prior to the scheduled evidentiary hearing. With respect to additional objections, Fifth Avenue need not apprise this Court that it objects to Great East's calculation of net mitigation

proceeds because the Court is already aware of that dispute. Because the Court does not presently have sufficient information to resolve said dispute, this matter will be addressed at, or prior to, the scheduled evidentiary hearing or by subsequent stipulation between the parties.

After the amount of Great East's damages is determined, then said damages must be subjected to the limitation called for in § 502(b)(6). Put another way, this Court will reward to Great East the lesser of either its actual damages or the computed limitation under § 502(b)(6).

## II. Calculation of the limitation under § 502(b)(6).

### A. Whether the § 502(b)(6) limitation in this case shall be calculated from the petition filing date or an earlier date (i.e., whether Fifth Avenue "surrendered" or Great East "repossessed" the leased premises prior to the petition filing date)?

█ The parties strongly disagree as to the appropriate manner in which the limitation of § 502(b)(6), or the cap, should be calculated, both in general and in this particular case. Their major source of contention is the appropriate date from which the cap should be calculated, with Great East arguing for the petition filing date and Fifth Avenue countering with an earlier date upon which, it alleges, surrender or repossession of the leased property occurred. Section 502(b)(6) is clear in that the cap shall be calculated from the date of the earlier of the aforementioned events. However, the precise meaning of "surrendered" and "repossessed" as used in § 502(b)(6) is anything but clear. This Court recognizes, as have other courts, that the two terms may have several meanings within the context of a lease. *In re Iron–Oak Supply Corp.,* 169 B.R. 414, 417 (Bankr.E.D.Cal.1994) (citing 83 C.J.S. *Surrender* (1953) for the point that "[p]lain language is useless in interpreting a word like 'surrender' ... [because it] has multifarious

---

**3.** Of course, if the lease was terminated under Ohio law prior to the commencement of this bankruptcy case, then there was not a deemed

rejection of the lease under § 365(d)(4) because the lease could not have been assumed pursuant to 11 U.S.C. § 365(c)(3).

meanings"). Nevertheless, "[i]t is axiomatic that the meaning of . . . word[s] in a federal statute is a question of federal law." *Id.* This Court, after considerable research and thought, concludes that, because § 502(b)(6) deals with "damages resulting from the termination of a lease of real property," the use therein of the terms "repossessed" and "surrendered" must necessarily refer to the events that effect a termination of a real property lease under state law. In this regard, the Court cites as support, and adopts the rationale of the court in, *Iron–Oak,* 169 B.R. at 418 ("whether a leasehold was 'surrendered' for purposes of section 502(b)(6) before bankruptcy is governed by state law"); *see also In re Lomax,* 194 B.R. 862, 865–66 (9th Cir. BAP 1996) (applying California law to determine whether surrender/termination had occurred under § 502(b)(6)); *In re Allegheny Intern., Inc.,* 136 B.R. at 403–04 (the court, while not explicitly concluding that "surrender" under § 502(b)(6) is defined as it is under Pennsylvania state law, nevertheless essentially applied Pennsylvania law in determining whether "surrender" had occurred under § 502(b)(6)).

This Court's conclusion coincides with Great East's contention that these terms, as used in § 502(b)(6), must be defined by reference to pertinent state law which, in this case, is that of Ohio. In Ohio (a) a lessee cannot unilaterally effect a surrender of leased premises, (b) a lessee's unilateral offer of surrender accomplishes nothing more than an abandonment, (c) an abandonment, unlike a surrender that has received landlord consent, does not result in a termination of the lease agreement, and (d) mere reentry of the leased premises by a lessor with the intent only to mitigate damages and not to terminate the lease does not result in a termination of the lease. *Morris Investment Company v. Sawyer Indian Hill Apothecary,* 63 Ohio Misc.2d 202, 620 N.E.2d 313 (Mun. Ct.1993) (citing numerous cases that uniformly state the law of Ohio on this issue). Therefore, Great East essentially contends,

and this Court agrees, that the language in § 502(b)(6)(A)(ii)—i.e., "the date on which such lessor repossessed, or the lessee surrendered, the leased property"—must be equated with the date on which state law termination of the lease occurred.

Fifth Avenue disagrees with Great East and this Court, asserting that "surrendered" or "repossessed," as used in § 502(b)(6)(A)(ii), must have a meaning independent of their state law counterparts because, otherwise, state law would somehow conflict with the intent of Congress as embodied in § 502(b)(6) (i.e., federal bankruptcy law), which would violate Article VI, clause 2 of the United States Constitution (the Supremacy Clause).[4] Fifth Avenue instead contends that "surrendered" and "repossessed" mean, respectively, merely (a) a unilateral turnover of possession of the leased premises by a lessee to the lessor regardless of whether said action results in a termination of the lease under state law, and (b) a reentry of the premises by a lessor regardless of whether the lessor intends to and, thereby, does, effect a termination of the lease. This Court simply cannot agree with Fifth Avenue's interpretation, however, because it (a) presupposes that this Court's conclusion results in a Supremacy Clause conflict, which is incorrect, (b) disregards pertinent legislative history surrounding enactment of § 502(b)(6), and (c) would, if accepted, result in a process for calculation of lease damages that strains notions of common sense.

This Court agrees, as did the *Iron–Oak* court, with the principle that "[s]tate laws are suspended in bankruptcy . . . to the extent that they actually conflict with the Bankruptcy Code," *Iron–Oak,* 169 B.R. at 417 (citing *Butner,* 440 U.S. at 54 note 9, 99 S.Ct. at 918 note 9). However, this Court also agrees with the *Iron–Oak* court that "[s]ection 502(b)(6) is not plainly in conflict with, and is perhaps only ambiguous relative to, state law." *Id.* This Court simply re-

---

4. Article VI, clause 2 of the United States Constitution provides that:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the contrary notwithstanding.

jects the reasoning of *Fifth Avenue* that, because there would be a Supremacy Clause conflict if "surrender" under § 365(d)(4) were to be defined by a state's law, there must also necessarily be a similar conflict in § 502(b)(6). This Court, therefore, finds that state law can be harmonized, rather than brought into conflict, with § 502(b)(6) if "surrendered" and "repossessed" are defined by reference to state law. *Iron–Oak,* 169 B.R. at 417.

Fixing the date upon which a lease is terminated under state law as the date upon which, pursuant to § 502(b)(6), the leased premises were either "repossessed" or "surrendered" is also neither inconsistent nor in conflict with the purpose of § 502(b)(6), which was "designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." H.R.Rep. No. 595, 95th Cong., 1st Sess., 352–54 (1977); S.Rep. No. 989, 95th Cong., 2nd Sess., 62–65 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 6307–6310, *reprinted in Norton Bankruptcy Law and Practice 2d,* 1995–96 Ed., at 390. Although Congress sought to limit the amount of damages that a landlord could recover from a bankrupt debtor, Congress only placed said limitations on a landlord's claims for post-petition damages,[5] 11 U.S.C. § 502(b)(6)(A), while ensuring that said landlord recovers on those damages incurred up to the earlier of lease termination or the petition filing. 11 U.S.C. § 502(b)(6)(B). This proposition, while evidenced by the language of § 502(b)(6) itself, is also supported by legislative history pointing out that the limitation under § 502(b)(6) of a lessor's damages in bankruptcy is equitable because "in a true lease of real property, the lessor retains all risk and benefits as to

the value of the real estate at[, but not prior to,] the *termination* of the lease." *Norton Bankruptcy Law and Practice 2d,* 1995–96 Ed., at 391 (emphasis added). This passage from the legislative history captures the essence of termination under uniform state law because, prior to a state law termination of a lease, a tenant may cure a default and reenter the premises to take further advantage of the benefits of the leased premises but, subsequent to a state law termination, the lessee may no longer do so and the lessor then retains any future benefits in the leased premises. *Iron–Oak,* 169 B.R. at 418. Therefore, it only makes sense that Congress, in its effort to properly allocate risks and benefits, would limit a landlord's recovery for damages incurred post-termination but allow full recovery of those incurred pre-termination. However, because termination of a commercial realty lease generally occurs as a matter of bankruptcy law no later than "60 days after the date of the order for relief" unless said lease is affirmatively assumed (i.e., when a deemed rejection occurs under § 365(d)(4)), *Elephant Bar,* 195 B.R. at 356, Congress also capped recovery of post-petition damages regardless of whether state law termination had occurred.[6]

Finally, because the amount of a landlord's claim prior to application of the § 502(b)(6) cap is ascertained by reference to the lease agreement and the application of pertinent state law (i.e., state law definitions of surrender and repossession control), it does not seem to this Court to make sense that the § 502(b)(6) cap should be calculated with identical terminology defined in a different manner. The Court also cannot believe that Congress intended such a result because it certainly had to have been aware when it drafted § 502(b)(6) that "surrender" and "re-

---

5. Of course, if lease termination occurs prior to the petition filing, then § 502(b)(6) need not operate to cap recovery of future damages as there cannot be any future damages. See discussion of this point *infra* at 380.

6. This court also agrees with the following passage from *Iron–Oak:*

Indeed, a contrary rule would invite mischief. Consider what the result would be if: (1) a tenant, claiming surrender, stopped paying rent sixty months before the end of a lease term and twenty-four months before bankruptcy; and (2) the landlord had valid, enforceable state-court judgments for twenty-four months of rent as of the filing of bankruptcy. A different federal meaning of surrender could operate retroactively to take away half of the amount of the landlord's judgment.

*Iron–Oak,* 169 B.R. at 418 note 6. Contrary to *Fifth Avenue's* assertion, the perpetration of such "mischief" was neither a purpose, nor intended by the enactment, of § 502(b)(6).

possess" have significant, as well as uniform,[7] meaning under each state's law. However, if Congress intended to stray from the uniform legal meanings of these two terms, this Court would have expected, at a minimum, inclusion by Congress of a definitional subsection elsewhere in the Bankruptcy Code.

Put simply, this Court holds that the date upon which the leased premises were either "repossessed" or "surrendered" for purposes of § 502(b)(6)(A)(ii) is that date upon which the lease was terminated under state law. Consistent with the law of Ohio, termination of the lease in this case could not have occurred unless Great East either accepted Fifth Avenue's offer of surrender or reentered the leased premises with the intent to terminate the lease. Absent proof of one of those occurrences pre-petition, the petition filing date is the pertinent date for calculation of the cap. As mentioned above when discussing calculation of Great East's damages, an evidentiary hearing will be scheduled to determine whether the lease was terminated under Ohio law pre-petition, and if so, the date upon which that event occurred.

██ Although the issue set forth above must await resolution via an evidentiary hearing, this Court can resolve other issues that exist regarding calculation of the cap. First of all, if termination of the lease under Ohio law did not occur prior to April 16, 1996 (i.e., the petition filing date), then April 16, 1996 is the date from which the cap is calculated. However, "the rent reserved by . . . [the] lease, without acceleration, for . . . one year[8] . . . following" April 16, 1996 would consist of rent through November 30, 1996, or seven and one-half (7 1/2) months of rent,

rather than one full year of rent at the monthly rental rate as calculated by Great East. This is because the lease itself does not reserve to Great East rent past November 30, 1996; put another way, "the rent reserved by . . . [the] lease" from December 1, 1996 to April 15, 1997 equals zero (0). Second, if termination of the lease under Ohio law preceded April 16, 1996, then the date of that state law termination is the pertinent date for calculation of the cap. However, "the rent reserved by . . . [the] lease, without acceleration, for . . . one year[9] . . . following" that date would be zero (0) because (a) said termination relieves a lessee of further obligation under the lease and prevents a lessor from recovering any damages that would accrue post-termination, and (b) therefore, the lease does not—indeed could not—reserve any rent for any period following said termination. The Court views this proposition as proper because it does not believe that Congress would have included in the cap a provision for damages that could not be recovered under pertinent state law. Furthermore, this position is also consistent with the legislative history referred to above because, at the point of state law termination, "the lessor retains all risk and benefits as to the value of the real estate."

**B.** *Whether charges in addition to unpaid rent can be included in the cap under § 502(b)(6), and whether mitigation of actual damages impacts calculation of the cap?*

██ With respect to whether Great East can include in the cap charges in addition to unpaid rent,[10] this Court adopts the

---

7. This Court is perplexed at Fifth Avenue's suggestion that this Court's holding will add complexity to the Bankruptcy Code by defining two terms used therein by reference to "fifty different state law definitions." As pointed out in *Iron-Oak*, 169 B.R. at 418, and *Windsor*, 201 B.R. at 135–37, state landlord/tenant law regarding surrender, repossession, and termination of commercial realty leases is fairly, if not entirely, uniform. Therefore, defining these terms by reference to state law will add neither complexity nor nonuniformity to the Bankruptcy Code.

8. Since the remaining term of the lease from April 16, 1996, was seven and one-half (7 1/2)

months, or until November 30, 1996, one year is greater than fifteen (15) percent of said term.

9. Since (a) the earliest date upon which the lease could have been terminated under Ohio law was March 29, 1994, and (b) the remaining term of the lease from March 29, 1994, was thirty-two (32) months, or until November 30, 1996, one year is greater than fifteen (15) percent of said term.

10. This analysis is separate from the issue of whether said charges can constitute a portion of Great East's claims *prior to application of the cap*. That issue was addressed earlier in this opinion, *see supra* at 376–77.

following three-part test for such determination set forth in *In re McSheridan,* 184 B.R. 91 (9th Cir. BAP 1995):

> 1) [In order for an additional charge to be included in the cap, t]he charge must: (a) be designated as 'rent' or 'additional rent' in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;
>
> 2) The charge must be related to the value of the property or the lease thereon; and
>
> 3) [T]he charge must be properly classifiable as rent because it is a fixed, regular or periodic charge.

*Id.* at 99–100.[11] Applying this test to the additional items set forth by Great East in its claims yields the following results:

(i) Liquidated Damages—although a provision for these is included in Great East's lease agreement and they relate to the value of the lease, they may not be included in the cap as rent because they are not a fixed, regular, or periodic charge. Liquidated damages are clearly not regular or periodic, and they also cannot be fixed because they are only recoverable in the event of a contractual default such as that which Fifth Avenue committed in this case.

(ii) Real Estate Taxes, Insurance, and Common Area Maintenance Fees—these are clearly included in the cap because they are designated as "additional rent" in Great East's lease agreement, they relate to the value of the leased premises, and they are fixed, regular, and/or periodic charges.

(iii) Service Charges and Reletting Costs—these are not included in the cap because, although provision for them may be found in Great East's lease agreement, they are not related to the value of either the leased premises or the lease thereon, and they also are not in the nature of a fixed and regular charge.

(iv) Interest on the State Court Judgment—this cannot be included in the cap for several reasons. First of all, the Court is not aware of a provision for this charge in the lease agreement itself. Furthermore, even if there is such a provision, this Court cannot allow a claim for post-petition interest because, as of the petition filing date, it constituted "unmatured interest" which is not permitted under 11 U.S.C. § 502(b)(2).

With respect to the effect that mitigation of damages has on calculation of the cap, this Court agrees with the overwhelming majority of courts that have previously addressed this issue and that hold that "the statutory cap [is] computed in accordance with the ordinary language of section 502(b)(6) *ignoring mitigation.*" *Iron–Oak,* 169 B.R. at 420 (emphasis added) (calculation of "total rejection damages [before application of the cap], [however,] . . . take mitigation into account"); *In re Financial News Network, Inc.,* 149 B.R. 348, 353 (Bankr.S.D.N.Y.1993) (citing several cases for this proposition including *In re Bob's Sea Ray Boats, Inc.,* 143 B.R. 229, 231 (Bankr.N.D.1992); and *In re Goldblatt Bros.,* 66 B.R. 337, 347–48 (Bankr.N.D.Ill. 1986)). Therefore, the cap shall not be reduced by any amounts that Great East has received by reletting the leased premises, although such mitigation shall figure into the calculation of its damages prior to application of said cap.

### III. Whether the Full Faith and Credit provision of the U.S. Constitution prevents this Court from applying § 502(b)(6) to Great East's state court judgment against Fifth Avenue?

Great East argues that the portion of its Claim #1 represented by its pre-petition state court judgment against Fifth Avenue cannot be reduced by virtue of the

---

11. This Court declines to follow the two-part test set forth in *In re Conston Corp., Inc.,* 130 B.R. 449 (Bankr.E.D.Pa.1991), wherein that Court held that "appendages to 'pure' rent are allowable as 'rent reserved' under § 502(b)(6) only if the lease expressly so provides *and* the charges in question are properly classifiable as rent because they are regular, fixed, periodic charges payable in the same way as 'pure' rent." *Id.* at 455. This Court agrees with the Court in *McSheridan* that "bankruptcy courts must make an independent determination of what constitutes 'rent reserved' because labels alone may be misleading." *McSheridan,* 184 B.R. at 99 (*see,* in particular, the discussion at footnote 7 of that opinion).

cap under § 502(b)(6) because said reduction would violate the Full Faith and Credit clause in Article IV, § 1 of the U.S. Constitution. Although the full faith and credit clause "requires only that [s]tates give full faith to the judicial proceedings of other [s]tates[,] ... the doctrine was extended by the Congress [in 28 U.S.C. § 1738] to require federal courts 'to give full effect to the final judgments of state courts.'" *In re Bus Stop, Inc.,* 3 B.R. 26, 27 (Bankr.S.D.Fla.1980). However, § 1738, "by its terms, [only] requires that the judgment be accorded the same effect that it would receive in the courts of that [s]tate."[12] *Id.* Because the underlying cause of action upon which a state court judgment is entered cannot be identical to a debtor's bankruptcy cause of action in the nature of an objection to a claim on the ground that said claim should be limited under § 502(b)(6), the state court judgment does not have res judicata effect in the debtor's action under § 502(b)(6). *Id.* Furthermore, and in any event, res judicata does "not prevent an examination of the record before the [s]tate court to determine the circumstances which prompted the judgment." *Id.*

▆▆▆▆▆ Moreover, "[i]t is, of course, clear that Congress in exercise of the bankruptcy clause in the federal constitution, Art. 1, § 8, is in no way restricted by [s]tate law or any act of a [s]tate court." *Id.* (relying on *Kuehner v. Irving Trust Co.,* 299 U.S. 445, 451, 57 S.Ct. 298, 301, 81 L.Ed. 340 (1937)). Any such restriction would, of course, constitute an impermissible conflict between federal bankruptcy law and state law in violation of the Supremacy Clause of the U.S. Constitution. That Congress intended for § 502(b)(6) to limit rent claims, even if in the form of state court judgments obtained pre-petition, is evidenced by the Bankruptcy Code's definition of "claim," which is defined as the "right to payment, *whether or not such right*

is reduced to judgment." 11 U.S.C.A. § 101(5)(A) (West 1993) (emphasis added); see also *Anthony v. Interform Corp.,* 96 F.3d 692, 695–96 (3rd Cir.1996) (citing *In re LHI Holding, Inc.,* 142 B.R. 1007, 1009 n. 2 (Bankr.M.D.Fla.1992), aff'd, 176 B.R. 255 (M.D.Fla.1994)) (noting the Bankruptcy Code's definition of "claim," which term is used throughout § 502(b) and, in particular, § 502(b)(7)). Therefore, reduction by this Court of that portion of Great East's Claim # 1 represented by its state court judgment is clearly constitutional.

This Court will limit said portion of Claim # 1 for the purpose of calculation of the cap under § 502(b)(6) in the event that the state court judgment includes a provision for either liquidated damages or service charges. However, an effective reduction of the state court judgment under § 502(b)(6) is only for the limited purpose of calculation of the cap, to which the actual damage claims of Great East must then be compared; calculation of the actual damage claims shall include the full amount of the state court judgment without any alteration by this Court.[13]

## IV. Whether Great East can recover a portion of its damage claims as an administrative expense pursuant to § 365(d)(3)?

▆▆▆▆ Great East argues that, pursuant to § 365(d)(3), it should be able to recover as an administrative expense that portion of its Claim # 2 for the 60–day period following April 16, 1996 (ie., until the lease was deemed rejected by operation of law under 11 U.S.C. § 365(d)(4)) regardless of the fact that (a) Fifth Avenue was not then in possession of the leased premises, and (b) Great East had relet the premises to an alternate tenant for its asserted purpose of mitigation of dam-

---

**12.** 28 U.S.C. § 1738 provides, in pertinent part, that the

> judicial proceedings of any court of any ... [s]tate ... shall be ... admitted in other courts within the United States and ... [s]uch ... judicial proceedings ... shall have the same full faith and credit in ... [said] court[s] ... as they have by law or usage in the courts of such [s]tate ... from which they are taken.

28 U.S.C.A. § 1738 (West 1994).

**13.** Indeed, the state court judgment has res judicata effect in this Court for the purpose of establishing the actual damages incurred by Great East at December 1, 1994, as a result of Fifth Avenue's breach of the lease agreement.

ages. Fifth Avenue, of course, opposes this position of Great East.

Section 365(d)(3) provides, in pertinent part, that:

[t]he trustee shall timely perform *all the obligations* of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, *notwithstanding section 503(b)(1) of this title.*

11 U.S.C.A. § 365(d)(3) (West 1993) (emphasis added). The majority of courts have "reason[ed] that the obligations imposed by § 365(d)(3) prior to rejection 'are not contingent upon any occupancy of the property; rather, they depend only on the existence of an unexpired non-residential property lease.'" *In re Slim Life Weight Loss Centers, Corp.*, 182 B.R. 701, 705 (Bankr.D.N.J. 1995) (citing *In re Cardian Mort. Corp.*, 127 B.R. 14, 16 (Bankr.E.D.Va.1991); *In re M.H.I., Inc.*, 61 B.R. 69, 70–71 (Bankr.D.Md. 1986); *In re Worths Stores Corp.*, 135 B.R. 112, 116–17 (Bankr.E.D.Mo.1991)); *In re Pacific–Atlantic Trading Co.*, 27 F.3d 401, 404–05 (9th Cir.1994) (expressly overruling the divergent authority within that circuit found in *In re Orvco*, 95 B.R. 724 (9th Cir. BAP1989)); *In re Wingspread Corp.*, 116 B.R. 915, 925–26 (Bankr.S.D.N.Y.1990); *In re Twigland Fashions, Inc.*, 198 B.R. 199, 200–01 (W.D.Tex.1996); *In re Merry–Go–Round Enterprises, Inc.*, 1996 WL 69688 at 3 (Bankr.D.Md.1996). These courts, furthermore, have held that said obligations are entitled to an administrative priority regardless of whether they also satisfy the requirements of 11 U.S.C. § 503(b)(1)(A). *Id.* A minority of courts, however, maintain that an administrative priority cannot be granted unless the requirements of § 503(b)(1)(A) are first met. *Orvco*, 95 B.R. at 727–28 (effectively overruled in *Pacific–Atlantic Trading*, 27 F.3d at 404–05); *In re Tammey Jewels*, 116 B.R. 292, 294–95 (Bankr.M.D.Fla.1990). Because "[s]ection 503(b) has been interpreted to require that 'actual, necessary costs and expenses' are only those from which the

estate received a benefit," *Twigland*, 198 B.R. at 200, these courts insist that occupancy by the debtor is necessary before a claim for rent can be granted administrative expense status. *Orvco*, 95 B.R. at 726–28; *Tammey Jewels*, 116 B.R. at 293–95. For the following reasons, this Court finds that it is constrained to align itself with the majority and hold that lease obligations referred to in § 365(d)(3) are entitled to an administrative priority (a) without reference to § 503(b)(1)(A), and (b) regardless of whether the debtor occupies the leased premises.

First, the plain language of § 365(d)(3) requires performance by a trustee of "*all the obligations of the debtor*" under an unexpired commercial lease of realty "until such lease is assumed or rejected." Therefore, because, under state law including that of Ohio, a debtor lessee may retain an obligation to pay rent even after said debtor vacates leased premises, the trustee is required to satisfy said obligation even if the debtor no longer occupies said premises.[14] Furthermore, because this duty is imposed on the trustee without any qualification under § 503(b)(1)(A), occupancy of the leased premises by the debtor is expressly irrelevant to said duty. Second, the Court agrees with the court in *Merry–Go–Round* that:

There is not a windfall for landlords. Rather, there is an allocation of risks and benefits. The payment of administrative rent is the trustee's price for the 60 day window to determine if assumption or rejection of an unexpired lease is more beneficial for the bankruptcy estate.

*Merry–Go–Round*, 1996 WL 69688 at 3. Finally, this Court must remind Fifth Avenue that, "[w]hile there may be persuasive policy arguments in support of the minority position ..., 'the bankruptcy court cannot waive or modify Bankruptcy Code requirements that are plain and unambiguous because it agrees with the policy underlying ... [Fifth Avenue's] arguments.'" *Slim Life*, 182 B.R. at 706. Therefore, as a general proposition, Great East may recover as an administrative

---

14. The trustee could, of course, either relieve itself, or reduce the extent, of this obligation if it moved to reject the unexpired lease prior to the running of the 60–day period. However, such affirmative rejection by the trustee did not occur in this case.

expense that portion of its Claim #2 for the 60–day period following April 16, 1996.

Although having concluded in favor of Great East on this particular issue, this Court must nevertheless raise two caveats. First, Great East may not recover any administrative rental damages for the 60–day period preceding the deemed rejection of the lease if the lease was, in fact, terminated under Ohio law prior to the petition filing date in this case because, (a) pursuant to § 365(c)(3), the lease would then have been susceptible to neither assumption nor rejection by the trustee, and (b) under state law, the debtor would no longer have had any obligation with respect to the lease. Second, any claim for administrative rental damages during this period by Great East shall be reduced by the amount of payments that it has received by reletting the leased premises to alternate tenants. Such reduction is necessary because Great East cannot be compensated twice for only one obligation. Mitigation of an administrative rental claim is also appropriate because § 365(d)(3), unlike § 502(b)(6), regards an actual damage figure and not a limitation, or cap, thereon.

## CONCLUSION

The Court views those conclusions that it has made herein as a judgment on partial findings in accordance with Rule 52(c) of the Federal Rules of Civil Procedure, which is made applicable to this matter by Rule 7052 of the Federal Rules of Bankruptcy Procedure. However, the Court will await the resolution of the issue of whether and, if so, on what date, the lease in this case was terminated under Ohio law (ie., either by surrender or repossession) pre-petition before endeavoring to place dollar figures upon its conclusions of law. The Court does not see the point in engaging in precise calculations at this time because that issue impacts upon not only the actual amount of Great East's damage claims but also the amount of the cap under § 502(b)(6). Presumably, said resolution will be by way of an evidentiary hearing, which is scheduled as set forth in the order accompanying this opinion, unless the parties wish to stipulate subsequent to the issuance of this opinion. To that end, the parties are hereby directed by this Court to

prepare themselves to address whether the lease was terminated pre-petition under Ohio law. The burden of proof initially rests with Fifth Avenue to produce evidence that the lease was so terminated pre-petition. However, this Court also orders counsel for Great East to supply both counsel for Fifth Avenue and this Court with the following information:

(i) The precise monetary breakdown of the damages awarded to Great East in its state court judgment dated March 8, 1995 (ie., what amount compensated for unpaid rent, liquidated damages, common area maintenance, etc.). This information is necessary to accurately calculate the cap under § 502(b)(6); and

(ii) More detailed information regarding the reletting of the leased premises by Great East, including (a) the party to whom, (b) the rate at which, and (c) the date(s) upon which, the leased premises were relet. The Court has in mind copies of pertinent pages from the pertinent reletting documents, provided that such material is not voluminous. This information goes not only to whether the act of reletting resulted in a termination of the leased premises under Ohio law, but also (a) the amount of the actual damages in the event that they are exceeded by the cap, and (b) the appropriate amount of the administrative rent claim under § 365(d)(3), if any. Additional information regarding costs of reletting and service charges is also welcome and, thus, may also be submitted.

Counsel for Great East must comply with this direction (a) within twenty (20) days of the date of this opinion unless it establishes the necessity for, and requests, additional time, but (b) in no event, later than ten (10) days prior to the date of the evidentiary hearing as set forth in the order accompanying this opinion.

An appropriate order will be entered.

## ORDER OF COURT

**AND NOW** this **16th day** of **December, 1996,** upon consideration of (a) movant's objection to the claims of respondent, and (b)

briefs and supplemental documents filed by both parties regarding this matter, and subsequent to a hearing held on October 29, 1996, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. Respondent's claims shall be equal to the lesser of either its actual damages, computed by reference to the lease agreement and in compliance with Ohio law, or the computed limitation under 11 U.S.C. § 502(b)(6).

2. Respondent's actual damages may not presently be determined by this Court because a dispute exists among the parties regarding whether the lease was terminated under Ohio law pre-petition. Additionally, a dispute remains regarding the precise calculation of net proceeds received by respondent in mitigation of its damages.

3. For the reasons set forth in the accompanying opinion, the terms "repossessed" and "surrendered" as used in § 502(b)(6) necessarily refer to the events that effect a termination of a real property lease under state law. Consistent with the law of Ohio, which is the pertinent state law in this case, termination of the lease could not have occurred unless respondent either accepted movant's offer of surrender or reentered the leased premises with the intent to terminate the lease. Therefore, absent proof of one of those occurrences pre-petition, the petition filing date is the pertinent date for calculation of the § 502(b)(6) cap. Whether the lease was terminated pre-petition is, as mentioned in item # 2, a source of contention that presently cannot be resolved by this Court.

4. An evidentiary hearing regarding the disputed factual matters indicated in items # 2 and 3 is **scheduled** for **January 22, 1997, at 10:00 a.m.** in **1603–05 Federal Building, 1000 Liberty Avenue, Pittsburgh, PA 15222.** After resolution of these factual disputes, the cap under § 502(b)(6) shall be computed in accordance with the accompanying opinion.

5. The Full Faith and Credit provision of the U.S. Constitution, as well as 28 U.S.C. § 1738, does not preclude this Court from reducing that portion of respondent's Claim # 1 represented by its state court judgment. Said reduction will only occur, however, in the event that (a) the state court judgment includes a provision for either liquidated damages and/or service charges, and (b) the computed cap under § 502(b)(6) is less than the actual damages incurred by respondent.

6. That portion of respondent's Claim # 2 for the 60–day period following April 16, 1996 is entitled to an administrative priority without reference to 11 U.S.C. § 503(b)(1)(A), and despite the fact that movant did not then occupy the premises. However, said priority will be irrelevant if the lease was terminated pre-petition. Furthermore, respondent's administrative expense claim for this period shall be reduced by the net proceeds that it received in mitigation of its damages.

7. With regard to whether the lease was terminated under Ohio law pre-petition, which shall be determined conclusively at the hearing referred to in item # 4, movant has the initial burden of proof and must produce evidence tending to establish said termination. However, respondent is directed to furnish both this Court and movant's counsel with the information outlined on page 25 of the accompanying opinion. Respondent must submit said information (a) within twenty (20) days of the date of this order unless it establishes the necessity for, and requests, additional time, but (b) in no event, later than January 12, 1997.