In re EDWARDS THEATRES CIRCUIT, INC., a California corporation; Edwards Megaplex Holdings, LLC, a Delaware limited liability company; Edwards Theatres Management, LLC, a Delaware limited liability company; Edwards Entertainment 2000, Inc., a California corporation; Metro Edwards Corp., a California corporation; Norwalk Theatre Corp., a California corporation; Federal Amusement Corp., a California corporation; and affiliates, Debtors.

Nos. SA00–16475 JR, SA00–16476 JR to SA00–16482 JR, SA00–16484 JR, SA00–16486 JR to SA00–16488 JR, SA00–16491 JR, SA00–16492 JR, SA 00–16494 JR to SA00–16504 JR, SA00–16506 JR to SA00–16508 JR, SA00–16510 JR to SA00–16514 JR, SA00–16516 JR, SA00–16518 JR to SA00–16523 JR, SA00–16525 JR to SA00–16543 JR.

United States Bankruptcy Court,
C.D. California.

Aug. 5, 2002.

Eric D. Goldberg, Stutman, Treister & Glatt, Los Angeles, CA, for Debtors.

## OPINION

JOHN E. RYAN, Bankruptcy Judge.

### I. INTRODUCTION

Edwards Theatres, Inc. and its affiliated reorganized debtors (collectively, "Debtors")[1] objected to claims 375, 378, and 395, filed by Dulles Town Center Mall, LLC ("Dulles"). On Debtors' objection, I disallowed claim 378 as a duplicate of claim 395.

I also disallowed claim 395 based upon Debtors' Second Amended Plan of Reorganization (the "Plan"). Left with claim 375, Dulles filed claim 817 to amend claim 375.

Debtors now object to claim 817 because the amendment is futile.

### II. JURISDICTION

I have jurisdiction over this matter under 28 U.S.C. § 157(b)(1). This is a core proceeding under the Bankruptcy Code,[2] as defined in 28 U.S.C. § 157(b)(2)(B).

---

1. Debtors include Edwards Theatres Circuit, Inc. ("ETC"); Edwards Dulles 2000 ("ED2000"); Edwards Megaplex Holdings, LLC; Edwards Theatres Management, LLC; Edwards Entertainment 2000, Inc.; Metro Edwards Corp.; Norwalk Theatre Corp.; Federal Amusement Corp.; and affiliates.

2. Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

### III. STATEMENT OF FACTS

On February 12, 1999, ED2000 entered into a lease with Dulles (the "Lease") whereby ED2000 leased real property in Loudoun County, Virginia to construct a movie theatre (the "Theatre"). Two of ED2000's obligations under the Lease are at issue here.

First, the Lease obligated ED2000 to pay rent. The Lease defines rent as all of the monetary obligations of ED2000 and further provides that "Minimum Annual Rent, Minimum Monthly Rent, Percentage Rent, Real Property Taxes, Common Area Expenses or any other charge" are monetary obligations that constitute rent. Lease (Feb. 12, 1999), at Art. 5. Beginning on the "Commencement Date," ED2000 was to pay the rent. The "Commencement Date" was defined as

> the earlier of (a) Tenant's opening for business in the Premises to the public, or (b) twelve (12) months after the later of (i) Substantial Completion of the Landlord's Work, as defined in Section 4.2, or (ii) issuance of a building permit for the Tenant's Work by the County of Loudoun, as may be extended for Force Majeure (as defined in Section 4.6).

Lease (Feb. 12, 1999), at Art. 1, § 1.10.

Second, under the Lease, upon delivery of the Theatre "pad",[3] ED2000 was obligated to construct the Theatre at its own cost.

On March 12, 1999, ETC guaranteed Dulles that ED2000 would build the Theatre. However, ED2000 never built the Theatre.

On August 23, 2000, Debtors filed their chapter 11 bankruptcy petitions.[4] They also filed a motion to reject certain unex-pired leases of nonresidential, real property, including the Lease. Shortly thereafter, the Lease was rejected, and a claims bar date was set for January 31, 2001.

On January 29, 2001, Dulles filed claim 375 asserting that ED2000 owed it $2,025,000 as a result of the Lease rejection. Dulles also filed claim 378 claiming that ETC owed it over $15,000,000 for breaching its guaranty that ED2000 would construct the Theatre. On January 31, 2001, Dulles filed claim 395 asserting that ETC owed it over $15,000,000 for damages related to the guaranty.

On May 18, 2001, Debtors objected to claim 378 contending that it was a duplicate of claim 395. The objection was sustained by default, thereby leaving Dulles with claims 375 and 395.

After Debtors' disclosure statement was approved, Dulles voted its claims against the Plan. The Plan was confirmed, and the confirmation order was not appealed.

The Plan substantively consolidated Debtors' bankruptcy estates, including the estates of ED2000 and ETC. The Plan also provided that

> all guarantees by any of the Debtors of the obligations of any other Debtor existing prior to the Effective Date [of the Plan] (regardless whether such guaranty is secured, unsecured, liquidated, unliquidated, contingent, or disputed) shall be deemed eliminated so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor shall be deemed to be a single obligation of the consolidated Debtors.

Plan (July 23, 2001), at 35.

Later, Debtors objected to claims 395 and 375.

---

**3.** The "pad" is the land upon which the Theatre was to be built after the land had been graded and certified according to ED2000's requirements.

**4.** This case was originally assigned to the Hon. Lynne Riddle.

Debtors objected to claim 395 as duplicative of claim 375 because both claims arose from the rejection of the Lease. Dulles responded that claim 395 was not based on the Lease rejection, but rather it represented separate damages resulting from a prepetition breach of the Lease. According to Dulles, "[t]he obligation to construct a building [was] wholly separate from the obligation to pay rent." Brief in Support of Dulles Town Center Mall LLC's Objection to Debtors' Motion to Disallow Claim (Feb. 19, 2002), at 6.

Dulles further argued that its claim for breach of the guaranty was a "different claim ... [and] ha[d] nothing to do ... with the lease claim." Tr. of Proceedings (March 4, 2002), at 2. Dulles further argued that the obligation to build the Theatre and pay the Rent arose from "two separate and different contracts with severable obligations." *Id.* Dulles repeatedly asserted this distinction:

> On the lease guarantee issue, it's Dulles' position that there are really two separate types of claims asserted here.... The 502(b)(6) claim asserted against [ED2000] was expressly premised on the notion that it was rental obligations under the lease.... The claim that was filed against [ETC] is a different claim entirely. It has nothing to do per se with the payment of rent under the

lease.... The obligations, therefore, that were guaranteed by [ETC], were completely distinguishable from the obligation of [ED2000] to [Dulles] under the lease to pay rent.

Tr. of Proceedings (Feb. 4, 2002), at 50–52.

I held that ETC's guaranty obligation was not severable from ED2000's Lease obligations because the Plan, through its consolidation provisions, had effectively eliminated the guaranty obligation. Accordingly, I held claim 395 to be duplicative of claim 375.

Thereafter, Debtors objected to claim 375 on two grounds. First, Debtors contended that Dulles incorrectly calculated the claim under § 502(b)(6)(A),[5] by calculating damages based on 15% of the total rent due under the Lease instead of basing damages on 15% of the remaining term of the Lease. Second, Debtors argued that Dulles failed to use reasonable efforts to mitigate its damages resulting from the rejection of the Lease.

I held that the § 502(b)(6)(A) calculation should be based upon the total rent due under the Lease. I also held that Dulles had a duty to mitigate its damages resulting from the rejection of the Lease. *See In re Andover Togs, Inc.,* 231 B.R. 521 (Bankr.S.D.N.Y.1999); 4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY,

---

**5.** Section 502(b)(6) provides in pertinent part:
 (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that—
 ....
 (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
(i) the date of the filing of the petition; and
(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates; ....
11 U.S.C. § 502(b)(6)(A) & (B).

¶ 502.03[7][c], at 502–42 (15th ed. rev. 2001).

On March 8, 2002, Dulles amended claim 375 by filing claim 817. The amended claim sought at least $17,025,000 in damages resulting from the rejection of the Lease. By the amendment, Dulles sought $2,025,000 in "future rent" damages under § 502(b)(6)(A) and at least $15,000,000 in damages for ED2000's failure to build the Theatre as "unpaid rent" under § 502(b)(6)(B).

Debtors objected to the claim 817 on several grounds. First, Debtors asserted that Dulles should be precluded from amending because 1) the amendment would be futile, 2) Dulles was asserting a disguised new claim, and 3) the amendment would unfairly prejudice Debtors. Debtors also claimed that Dulles was barred by judicial estoppel[6] from asserting that the Theatre construction obligation was unpaid rent under § 502(b)(6) because Dulles previously asserted that the construction obligation was not rent.

In refuting Dulles' argument that the construction obligation constituted unpaid rent, Debtors asserted that the construction obligation did not constitute rent under the Lease, nor did it satisfy the definition of rent set forth in *Kuske v. McSheridan (In re McSheridan)*, 184 B.R. 91 (9th Cir. BAP 1995). Debtors argued that the *McSheridan* test was not only applicable to rent under § 502(b)(6)(A), but also to "unpaid rent" in § 502(b)(6)(B).[7] Additionally, Debtors asserted that when they filed bankruptcy they did not owe any unpaid rent.

Debtors further argued that under the Lease the construction obligation and the payment of rent were separate obligations. Therefore, the construction obligation was not a monetary obligation, but was instead a performance obligation unrelated to the payment of rent under the Lease.

According to Debtors, the Lease set forth different default treatments for payment obligations and performance obligations. For example, a rental default could be cured within ten days, whereas thirty days was allowed to cure a performance obligation.

Lastly, Debtors asserted that the construction obligation arose before the Commencement Date to pay rent.[8] Because the Commencement Date had not occurred when the petitions were filed, Debtors claimed that no rent was due under the Lease. Thus, even if the construction obligation somehow constituted rent, no unpaid rent was due as of the bankruptcy filings.

Dulles responded that the amendment should be allowed because the Ninth Circuit applies a liberal test for amending claims. Further, allowing the amendment would not be prejudicial to Debtors because they were required under the Plan to reserve funds to pay the $15 million claim, if allowed. Dulles also argued that the amendment was not barred by judicial estoppel because it never argued that ED2000 did not owe rent. Instead, it previously argued that the construction obligation did not constitute rent as to ETC. However, as to ED2000, Dulles maintained

---

6. *Debtors also argued that Dulles was barred by waiver and forfeiture from asserting that the Theatre construction obligation was rent. However, because judicial estoppel applies here, as later discussed, it is not necessary to address Debtors' arguments based on waiver and forfeiture.*

7. *See supra note 5.*

8. The Commencement Date would only occur after either the Theatre had been constructed, or twelve months after the commencement of the Theatre construction.

that it preserved arguing that the construction obligation constituted prepetition unpaid rent.

In maintaining that the Theatre construction obligation was unpaid rent under § 502(b)(6)(B), Dulles argued that the *McSheridan* test was inapplicable to § 502(b)(6)(B).

## IV. DISCUSSION

 The Ninth Circuit has a long established policy that an amendment to a proof of claim is to be liberally granted. *See Roberts Farms Inc. v. Bultman (In re Roberts Farms Inc.)*, 980 F.2d 1248, 1251 (9th Cir.1992). The crucial inquiry is whether the opposing party would be unduly prejudiced by the amendment. *Id.*

 Filing a proof of claim is analogous to filing a complaint in a civil action. . *See Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir.1995); *Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 552 (5th Cir.1985); *Nortex Trading Corp. v. Newfield*, 311 F.2d 163, 164 (2d Cir.1962). Amending a claim is governed by Federal Rules of Civil Procedure ("FRCP") 15(a), which is made applicable to bankruptcy proceedings by Rule 7015:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Fed.R.Bankr.P. 7015(a).

The Supreme Court interpreted FRCP 15(a) in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). There, the petitioner originally filed a complaint seeking recovery of what would have been her intestate share of her father's estate. She alleged that she and her father had agreed that he would not make a will if she would care for and support her mother. However, the petitioner's father did leave a will devising his property to the respondent, his second wife. The district court dismissed the complaint for failure to state a claim upon which relief could be granted agreeing with the respondent that the petitioner's oral agreement with her father was unenforceable under the applicable state statute of frauds. The day after the judgment was entered, the petitioner filed motions to vacate the judgment and to amend the complaint in order to assert a right of recovery in quantum meruit, which the district court denied. The court of appeals affirmed the district court's order denying the petitioner's motion to amend the complaint. *Foman*, 371 U.S. at 179–80, 83 S.Ct. 227.

 As to the denial of the petitioner's motion to amend, the Supreme Court stated that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id.* at 182, 83 S.Ct. 227. Further,

> in the absence of any apparent or declared reason—such as undue delay, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, *futility of amendment*, etc.—the leave [to amend] sought should, as the rules require, be "freely given."

*Id.* (emphasis added). *See also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538 (9th Cir.1989) (citations omitted) (stating that courts must consider the presence or absence of undue delay, bad faith, undue prejudice to the opposing par-

ty, and futility of the proposed amendment when determining whether justice requires granting leave to amend).

Typically, an amendment to clarify a claim is not considered futile. *See N. Slope Borough v. Rogstad (In re Rogstad),* 126 F.3d 1224, 1228 (9th Cir.1997). However, "[w]here the legal basis for a cause of action is tenuous, futility supports the refusal to grant leave to amend." *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 986 (9th Cir.1999) (citation omitted) (discussing a cause of action not yet established by any appellate court or statute). An amendment is also futile when it is factually impossible for the plaintiff to amend the complaint so as to satisfy all elements of a claim. *See Schmier v. U.S. Court of Appeals for the Ninth Circuit,* 279 F.3d 817, 824 (9th Cir.2002) (citation omitted) (stating that plaintiff did not have standing). *See also Smith v. Commanding Officer, Air Force Accounting & Fin. Ctr.,* 555 F.2d 234, 235 (9th Cir.1977) (stating that the amendment would be futile because the plaintiff could not prevail on the merits in light of the government's immunity).

Here, allowing claim 817 would be futile. First, Dulles can only prevail if the construction obligation is held to be rent. However, Dulles is precluded by judicial estoppel from arguing that the construction obligation is rent, and even if this was not the case, the construction obligation does not constitute unpaid rent under the *McSheridan* test.

A. *Judicial Estoppel Prevents Dulles from Claiming that the Construction Obligation is Rent.*

Dulles is barred by judicial estoppel from claiming that the construction obligation is rent. In a recent decision, the Supreme Court discussed the elements of judicial estoppel:

First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position.... A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine,* 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citations omitted). The purpose of judicial estoppel is to protect the integrity of the judicial process. *Id.* at 750, 121 S.Ct. 1808.

In *New Hampshire,* the Court held that New Hampshire was judicially estopped from asserting a new location for the boundary line between it and Maine. The boundary between New Hampshire and Maine had actually been set in a 1740 decree by England's King George II. In 1977, a dispute arose over the meaning of phrases in the 1740 decree, such as "middle of the river" and "middle of the harbor." *New Hampshire,* 532 U.S. at 746, 121 S.Ct. 1808. However, the states proposed a consent decree in which they agreed that "middle of the river" referred to the middle of the Piscataqua River's main channel of navigation. *Id.* at 747, 121 S.Ct. 1808.

In 2001, New Hampshire asserted a different location for the river boundary. The Court held that judicial estoppel "best [fit] the controversy," and that New Hampshire was "equitably barred from asserting—contrary to its position in the 1970's litigation—that the inland Piscataqua River boundary runs along the Maine shore." *Id.* at 749, 121 S.Ct. 1808.

The doctrine of judicial estoppel applies here. First, the record clearly

shows that Dulles previously took the position that the construction obligation was not rent under the Lease. Dulles consistently contended that it had two separate and distinct claims against Debtors. Dulles maintained this position throughout the Plan confirmation proceedings as well as in its opposition to Debtors' objection to claim 395. Now, Dulles seeks to reclassify the construction obligation as rent by amending claim 375.

Second, because Dulles asserted that it had two separate claims, it was permitted to vote twice against the Plan. Debtors counted both votes, and the court counted those votes in deciding whether to confirm the Plan. The court, therefore, accepted Dulles' assertion that it held two separate claims against Debtors.

Third, Dulles would derive an unfair advantage and impose an unfair detriment on Debtors if Dulles were allowed to proceed with the amended claim, and Dulles' contentions to the contrary are without merit. Dulles has twice failed to convince the court that its claim for breach of the guaranty should be allowed. Debtors have already expended significant estate resources in objecting to claims 378 and 395. Dulles now attempts to take a third bite at the apple. Forcing Debtors to defend against this same issue through the guise of claim 817 would be detrimental and prejudicial to the estate. Accordingly, Debtors have satisfied all the elements for judicial estoppel. Therefore, Debtors' objection to claim 817 should be sustained.

### B. *The Construction Obligation is not Rent under the McSheridan Test*

■ A second reason that Dulles' proposed amendment is futile is that the construction obligation does not constitute unpaid rent under § 502(b)(6)(B). The purpose of § 502(b)(6) is "to compensate a landlord for the loss suffered upon termi-

nation of a lease, while not permitting large claims for breaches of long-term leases, which would prevent other general unsecured creditors from recovering from the estate." *McSheridan,* 184 B.R. at 97 (citation omitted). Section 502(b)(6)(A) applies to postpetition rent reserved under a lease and (B) applies to unpaid prepetition rent.

■ In *McSheridan,* the Ninth Circuit BAP formulated a three-part test to determine what charges under a lease "constitute 'rent reserved' under § 502(b)(6)(A)":

1) The charge must: (a) be designated as "rent" or "additional rent" in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;

2) The charge must be related to the value of the property or the lease thereon; and

3) the charge must be properly classifiable as rent because it is a fixed, regular or periodic charge.

*McSheridan,* 184 B.R. at 99–100.

Here, Dulles is claiming that the construction obligation constitutes "unpaid rent" under § 502(b)(6)(B) and that the definition of rent is not limited by the *McSheridan* test. However, a number of courts have applied the *McSheridan* test to § 502(b)(6)(B).

In *Smith v. Sprayberry Square Holdings, Inc. (In re Smith),* 249 B.R. 328 (Bankr.S.D.Ga.2000), a landlord filed a proof of claim in the debtor's bankruptcy seeking an unamortized building allowance. The landlord had paid the building allowance to the debtor for construction work necessary to make the leased premises suitable for the debtor's business. *Id.* at 331–32. The landlord agreed that postpetition charges must fit within the definition of rent under § 502(b)(6)(A), but argued that § 502(b)(6)(B) did not limit outstanding prepetition charges to

rent. Instead, all unpaid prepetition amounts allowed under state law should be permitted under § 502(b)(6)(B). *Id.* at 336.

Although the *Smith* court recognized that *McSheridan* addressed only § 502(b)(6)(A), it rejected the landlord's argument, adopting the *McSheridan* test for the determination of rent under both § 502(b)(6)(A) and (B). *Id.* at 337. The court then rejected the landlord's claim for the unamortized building allowance because it failed to meet the *McSheridan* test. First, the court found that the allowance was not designated as rent. Second, absent default, the landlord had no expectation of recouping any part of the allowance. Therefore, it was not related to the value of the property or the lease. Third, the allowance was never a fixed, regular, or periodic charge because it only became due on default. Thus, the construction allowance failed to constitute rent under *McSheridan*. *Id.* at 339.

In *Fifth Avenue Jewelers, Inc. v. Great East Mall, Inc. (In re Fifth Avenue Jewelers, Inc.)*, 203 B.R. 372 (Bankr.W.D.Pa. 1996), a landlord sought prepetition and postpetition claims from the debtor's breach of a lease. The landlord sought to include additional charges, including liquidated damages, in the "unpaid rent" portion of the claim against the debtor: "[w]ith respect to whether [the landlord] can include in the cap charges in addition to unpaid rent, this Court adopts the ... three-part test for such determination set forth in *In re McSheridan*." *Id.* at 380–81.

The court in *Fifth Avenue Jewelers* held that the charge for liquidated damages did not constitute rent under *McSheridan*. Although the lease made a provision for the liquidated damages and they related to the value of the lease, they were not fixed, regular, or periodic charges. Like *Smith*, the liquidated damages became recoverable only in the event of a contractual default. *Id.* at 381.

■ I am not persuaded that the term "rent" should be viewed differently between the subsections of § 502(b)(6). If the purpose behind § 502(b)(6) is to be achieved, a restrictive view of what constitutes rent should apply to both subsections. Therefore, the *McSheridan* test, which appropriately embodies the purpose behind § 502(b)(6), applies to both § 502(b)(6)(A) and (B).

■ Here, the construction obligation clearly fails to satisfy the *McSheridan* test. First, the Lease does not denominate the construction obligation as rent. As Dulles conceded in court proceedings, the construction obligation was specified as a performance obligation under the Lease, and not as rent. Only monetary obligations constituted rent under the Lease. Additionally, the construction obligation and the obligation to pay rent were under different sections of the Lease. Also, default provisions were different for the failure to pay rent and to build the Theatre. Further, it is evident from the extensive proceedings in this court that neither ED2000 nor Dulles considered the construction obligation to be rent under the Lease.

Second, the construction obligation does not relate to the value of the leased premises or the value of the Lease. The Lease is for the pad upon which the Theatre was to be built at ED2000's sole expense. Dulles had no obligation to pay for the construction costs. Thus, as in *Smith*, Dulles had no expectation to recoup any costs incurred by Debtors in building the Theatre and installing furniture, fixtures, and equipment.

Third, the construction obligation is not a fixed, regular, or periodic payment. The construction obligation was a one-time per-

formance obligation that did not require ED2000 to pay anything to Dulles. In addition, the construction obligation did not establish any fixed, periodic, or regular charges that ED2000 was to pay its contractors or subcontractors to construct the Theatre. Further, the Lease provided that once the Theatre was built, ED2000 had no further construction obligation to Dulles.

Finally, even if the construction obligation was accepted as rent under the Lease, no "unpaid rent" was due and owing, as of the petition date. ED2000 was to begin paying rent on the Commencement Date, which never occurred. Therefore, no rent ever became due as of the petition date for Dulles to claim as "unpaid rent" under § 502(b)(6)(B).

Accordingly, the Objection is sustained.

## V. CONCLUSION

In sum, claim 817 is futile because Dulles is judicially estopped from claiming that the construction obligation is rent, and the construction obligation does not constitute unpaid rent under the *McSheridan* test. Therefore, the Objection is SUSTAINED.

This opinion shall constitute my findings of fact and conclusions of law.